## LODGE 76, INTERNATIONAL ASSOCIATION OF MACHINISTS & AEROSPACE WORKERS, AFL–CIO, ᴇᴛ ᴀʟ. *v.* WISCONSIN EMPLOYMENT RELATIONS COMMISSION ᴇᴛ ᴀʟ.

No. 75–185.   Argued March 22, 1976—Decided June 25, 1976

BRENNAN, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, MARSHALL, BLACKMUN, and POWELL, JJ., joined. POWELL, J., filed a concurring opinion, in which BURGER, C. J., joined, *post*, p. 155. STEVENS, J., filed a dissenting opinion, in which STEWART and REHNQUIST, JJ., joined, *post*, p. 156.

*Gerry M. Miller* argued the cause for petitioners. With him on the briefs were *David Previant, Robert E. Gratz*, and *Plato E. Papps*.

*James C. Mallatt* argued the cause for respondents. With him on the brief for respondent Kearney & Trecker Corp. were *David J. Cannon, Jacob L. Bernheim*, and *John R. Sapp. Bronson C. La Follette*, Attorney General of Wisconsin, and *Charles D. Hoornstra*, Assistant Attorney General, filed a brief for respondent Wisconsin Employment Relations Commission.

*Norton J. Come* argued the cause for the National Labor Relations Board as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Bork* and *John S. Irving*.*

MR. JUSTICE BRENNAN delivered the opinion of the Court.

The question to be decided in this case is whether federal labor policy pre-empts the authority of a state labor relations board to grant an employer covered by the National Labor Relations Act an order enjoining a union and its members from continuing to refuse to work overtime pursuant to a union policy to put economic pressure on the employer in negotiations for renewal of an expired collective-bargaining agreement.

A collective-bargaining agreement between petitioner Lodge 76 (Union) and respondent Kearney & Trecker

---

*J. Albert Woll* and *Laurence Gold* filed a brief for the American Federation of Labor and Congress of Industrial Organizations as *amicus curiae* urging reversal.

Corp. (employer) was terminated by the employer pursuant to the terms of the agreement on June 19, 1971. Good-faith bargaining over the terms of a renewal agreement continued for over a year thereafter, finally resulting in the signing of a new agreement effective July 23, 1972. A particularly controverted issue during negotiations was the employer's demand that the provision of the expired agreement under which, as for the prior 17 years, the basic workday was seven and one-half hours, Monday through Friday, and the basic workweek was 37½ hours, be replaced with a new provision providing a basic workday of eight hours and a basic workweek of 40 hours, and that the terms on which overtime rates of pay were payable be changed accordingly.

A few days after the old agreement was terminated the employer unilaterally began to make changes in some conditions of employment provided in the expired contract, e. g., eliminating the checkoff of Union dues, eliminating the Union's office in the plant, and eliminating Union lost time. No immediate change was made in the basic workweek or workday, but in March 1972, the employer announced that it would unilaterally implement, as of March 13, 1972, its proposal for a 40-hour week and eight-hour day. The Union response was a membership meeting on March 7 at which strike action was authorized and a resolution was adopted binding Union members to refuse to work any overtime, defined as work in excess of seven and one-half hours in any day or 37½ hours in any week. Following the strike vote, the employer offered to "defer the implementation" of its workweek proposal if the Union would agree to call off the concerted refusal to work overtime. The Union, however, refused the offer and indicated its intent to continue the concerted ban on overtime. Thereafter, the employer did not make effective the proposed changes in the workday and workweek

before the new agreement became effective on July 23, 1972. Although all but a very few employees complied with the Union's resolution against acceptance of overtime work during the negotiations, the employer did not discipline, or attempt to discipline, any employee for refusing to work overtime.

Instead, while negotiations continued, the employer filed a charge with the National Labor Relations Board that the Union's resolution violated § 8 (b)(3) of the National Labor Relations Act, 49 Stat. 452, as amended, 29 U. S. C. § 158 (b)(3). The Regional Director dismissed the charge on the ground that the "policy prohibiting overtime work by its member employees . . . does not appear to be in violation of the Act" and therefore was not conduct cognizable by the Board under *NLRB* v. *Insurance Agents,* 361 U. S. 477 (1960). However, the employer also filed a complaint before the Wisconsin Employment Relations Commission charging that the refusal to work overtime constituted an unfair labor practice under state law. The Union filed a motion before the Commission to dismiss the complaint for want of "jurisdiction over the subject matter" in that jurisdiction over "the activity of the [Union] complained of [is] pre-empted by" the National Labor Relations Act. App. 11. The motion was denied and the Commission adopted the Conclusion of Law of its Examiner that "the concerted refusal to work overtime, is not an activity which is arguably protected under Section 7 or arguably prohibited under Section 8 of the National Labor Relations Act, as amended, and . . . , therefore, the . . . Commission is not pre-empted from asserting its jurisdiction to regulate said conduct." The Commission also adopted the further Conclusion of Law that the Union "by authorizing . . . the concerted refusal to work overtime . . . engaged in a concerted effort to interfere with production and . . . committed an unfair labor practice within the meaning

of Section 111.06 (2) (h). . . ." [1]  The Commission thereupon entered an order that the Union, *inter alia*, "[i]mmediately cease and desist from authorizing, encouraging or condoning any concerted refusal to accept overtime assignments . . . ." The Wisconsin Circuit Court affirmed and entered judgment enforcing the Commission's order. The Wisconsin Supreme Court affirmed the Circuit Court. 67 Wis. 2d 13, 226 N. W. 2d 203 (1975). We granted certiorari, 423 U. S. 890 (1975). We reverse.

I

"The national . . . Act . . . leaves much to the states, though Congress has refrained from telling us how much. We must spell out from conflicting indications of congressional will the area in which state action is still permissible." *Garner* v. *Teamsters Union*, 346 U. S. 485, 488 (1953). Federal labor policy as reflected in the National Labor Relations Act, as amended, has been construed not to preclude the States from regulating aspects of labor relations that involve "conduct touch[ing] interests so deeply rooted in local feeling and responsibility that . . . we could not infer that Congress had deprived the States of the power to act." *San Diego Unions* v. *Garmon*, 359 U. S. 236, 244 (1959). Policing of actual or threatened violence to persons or destruction of property has been held most clearly a matter for the States.[2]

---

[1] Wisconsin Stat. § 111.06 (2) (1974) provides:

"It shall be an unfair labor practice for an employe individually or in concert with others:

.　　　.　　　.　　　.　　　.

"(h) To take unauthorized possession of property of the employer or to engage in any concerted effort to interfere with production except by leaving the premises in an orderly manner for the purpose of going on strike."

[2] Thus *Automobile Workers* v. *Russell*, 356 U. S. 634 (1958), upheld state-court jurisdiction of a common-law tort action against

Similarly, the federal law governing labor relations does not withdraw "from the States . . . power to regulate where the activity regulated [is] a merely peripheral concern of the Labor Management Relations Act." *Id.,* at 243.[3]

a union to recover compensatory and punitive damages for malicious interference with the plaintiff's lawful occupation by mass picketing and threats of violence that prevented the plaintiff from entering the plant and engaging in his employment; *Youngdahl* v. *Rainfair, Inc.,* 355 U. S. 131 (1957), sustained state-court power to enjoin striking employees from threatening or provoking violence or obstructing or attempting to obstruct the free use of the streets adjacent to the struck plant, or free ingress and egress to and from the property; *Automobile Workers* v. *Wisconsin Emp. Rel. Board,* 351 U. S. 266 (1956), sustained state authority to vest jurisdiction in a state labor relations board to enjoin violent union conduct; *United Constr. Workers* v. *Laburnum Constr. Corp.,* 347 U. S. 656 (1954), held a state court not precluded from hearing and determining a common-law tort action based on conduct which, although an unfair labor practice under federal law, constituted threats of violence and intimidation that forced an employer to abandon all of its projects in the area. In short, a State still may exercise "its historic powers over such traditionally local matters as public safety and order and the use of streets and highways," *Allen-Bradley Local* v. *Wisconsin Emp. Rel. Board,* 315 U. S. 740, 749 (1942), for "[p]olicing of such conduct is left wholly to the states." *Automobile Workers* v. *Wisconsin Emp. Rel. Board,* 336 U. S. 245, 253 (1949).

[3] Thus *Machinists* v. *Gonzales,* 356 U. S. 617 (1958), held that a state court was not precluded from ordering the reinstatement by a union of a wrongfully expelled member and awarding him damages, even though the union's conduct might also involve an unfair labor practice, since there was only a remote possibility of conflict with enforcement by the National Labor Relations Board of national policy. And in *Hanna Mining Co.* v. *Marine Engineers,* 382 U. S. 181 (1965), we resolved the "troublesome question of where lies the line between permissible and federally preempted state regulation of [the] union activities" there presented, *id.,* at 183, by concluding that the Act's amendment expressly to exclude supervisory employees from the critical definition of "employees" eliminated any serious problems of pre-emption since "many provisions of the Act

Cases that have held state authority to be pre-empted by federal law tend to fall into one of two categories: (1) those that reflect the concern that "one forum would enjoin, as illegal, conduct which the other forum would find legal" and (2) those that reflect the concern "that the [application of state law by] state courts would restrict the exercise of rights guaranteed by the Federal Acts." *Automobile Workers* v. *Russell*, 356 U. S. 634, 644 (1958). "[I]n referring to decisions holding state laws pre-empted by the NLRA, care must be taken to distinguish pre-emption based on federal protection of the conduct in question . . . from that based predominantly on the primary jurisdiction of the National Labor Relations Board . . . , although the two are often not easily separable." *Railroad Trainmen* v. *Jacksonville Terminal Co.*, 394 U. S. 369, 383 n. 19 (1969). Each of these distinct aspects of labor law pre-emption has had its own history in our decisions, to which we now turn.

We consider first pre-emption based predominantly on the primary jurisdiction of the Board. This line of pre-emption analysis was developed in *San Diego Unions* v. *Garmon, supra,* and its history was recently summarized in *Motor Coach Employees* v. *Lockridge*, 403 U. S. 274, 290–291 (1971):

> "[V]arying approaches were taken by the Court in initially grappling with this pre-emption problem. Thus, for example, some early cases suggested the true distinction lay between judicial application of general common law, which was permissible, as opposed to state rules specifically designed to regulate

---

employing that pivotal term would cease to operate where supervisors were the focus of concern." *Id.,* at 188. Further, in *Linn* v. *Plant Guard Workers*, 383 U. S. 53 (1966), we held that the availability of a state judicial remedy for malicious libel would not impinge upon the national labor policy.

labor relations, which were pre-empted. See, *e. g.,* *Automobile Workers* v. *Russell,* 356 U. S. 634, 645 (1958). Others made pre-emption turn on whether the States purported to apply a remedy not provided for by the federal scheme, *e. g., Weber* v. *Anheuser-Busch, Inc.,* 348 U. S. 468, 479–480 (1955), while in still others the Court undertook a thorough scrutiny of the federal Act to ascertain whether the state courts had, in fact, arrived at conclusions inconsistent with its provisions, *e. g., Automobile Workers* v. *Wisconsin Employment Relations Bd.,* 336 U. S. 245 (1949). . . . [N]one of these approaches proved satisfactory, however, and each was ultimately abandoned. It was, in short, experience—not pure logic—which initially taught that each of these methods sacrificed important federal interests in a uniform law of labor relations centrally administered by an expert agency without yielding anything in return by way of predictability or ease of judicial application.

"The failure of alternative analyses and the interplay of the foregoing policy considerations, then, led this Court to hold in *Garmon,* 359 U. S., at 244:

" 'When it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by § 7 of the National Labor Relations Act, or constitute an unfair labor practice under § 8, due regard for the federal enactment requires that state jurisdiction must yield. To leave the States free to regulate conduct so plainly within the central aim of federal regulation involves too great a danger of conflict between power asserted by Congress and requirements imposed by state law.' "

See also *San Diego Unions* v. *Garmon,* 359 U. S., at 244–247; *Lockridge, supra,* at 286–290.

However, a second line of pre-emption analysis has been developed in cases focusing upon the crucial inquiry whether Congress intended that the conduct involved be unregulated because left "to be controlled by the free play of economic forces." *NLRB* v. *Nash-Finch Co.,* 404 U. S. 138, 144 (1971).[4]   Concededly this inquiry was not made in 1949 in the so-called *Briggs-Stratton* case, *Automobile Workers* v. *Wisconsin Emp. Rel. Board,* 336 U. S. 245 (1949), the decision of this Court heavily relied upon by the court below in reaching its decision that state regulation of the conduct at issue is not pre-empted by national labor law.   In *Briggs-Stratton,* the union, in order to bring pressure on the employer during negotia-

---

[4] See Cox, Labor Law Preemption Revisited, 85 Harv. L. Rev. 1337, 1352 (1972):

"An appreciation of the true character of the national labor policy expressed in the NLRA and the LMRA indicates that in providing a legal framework for union organization, collective bargaining, and the conduct of labor disputes, Congress struck a balance of protection, prohibition, and laissez-faire in respect to union organization, collective bargaining, and labor disputes that would be upset if a state could also enforce statutes or rules of decision resting upon its views concerning accommodation of the same interests."

Cf. Lesnick, Preemption Reconsidered: The Apparent Reaffirmation of *Garmon,* 72 Col. L. Rev. 469, 478, 480 (1972):

"[T]he failure of Congress to prohibit certain conduct warrant[s a] negative inference that it was deemed proper, indeed desirable— at least, desirable to be left for the free play of contending economic forces.   Thus, the state is not merely filling a gap when it outlaws what federal law fails to outlaw; it is denying one party to an economic contest a weapon that Congress meant him to have available.

.        .        .        .        .

"The premise is . . . that Congress judged whether the conduct was illicit or legitimate, and that 'legitimate' connotes, not simply that federal law is neutral, but that the conduct is to be assimilated to the large residual area in which a regime of free collective bargaining—'economic warfare,' if you prefer—is thought to be the course of regulatory wisdom."

tions, adopted a plan whereby union meetings were called at irregular times during working hours without advance notice to the employer or any notice as to whether or when the workers would return. In a proceeding under the Wisconsin Employment Peace Act, the Wisconsin Employment Relations Board issued an order forbidding the union and its members to engage in concerted efforts to interfere with production by those methods. This Court did not inquire whether Congress meant that such methods should be reserved to the union "to be controlled by the free play of economic forces." Rather, because these methods were "neither made a right under federal law nor a violation of it" the Court held that there "was no basis for denying to Wisconsin the power, in governing her internal affairs, to regulate" such conduct. *Id.*, at 265.

However, the *Briggs-Stratton* holding that state power is not pre-empted as to peaceful conduct neither protected by § 7 nor prohibited by § 8 of the federal Act, a holding premised on the statement that "[t]his conduct is governable by the State or it is entirely ungoverned," 336 U. S., at 254, was undercut by subsequent decisions of this Court. For the Court soon recognized that a particular activity might be "protected" by federal law not only when it fell within § 7, but also when it was an activity that Congress intended to be "unrestricted by *any* governmental power to regulate" because it was among the permissible "economic weapons in reserve, . . . actual exercise [of which] on occasion by the parties, is part and parcel of the system that the Wagner and Taft-Hartley Acts have recognized." *NLRB* v. *Insurance Agents,* 361 U. S., at 488–489 (emphasis added). "[T]he legislative purpose may . . . dictate that certain activity 'neither protected nor prohibited' be deemed privileged against state regulation." *Hanna Mining Co.* v. *Marine Engineers,* 382 U. S. 181, 187 (1965).

## II

*Insurance Agents, supra,* involved a charge of a refusal by the union to bargain in good faith in violation of § 8 (b)(3) of the Act. The charge was based on union activities that occurred during good-faith bargaining over the terms of a collective-bargaining agreement. During the negotiations, the union directed concerted on-the-job activities by its members of a harassing nature designed to interfere with the conduct of the employer's business, for the avowed purpose of putting economic pressure on the employer to accede to the union's bargaining demands. The harassing activities, all peaceful, by the member insurance agents included refusal for a time to solicit new business, and refusal (after the writing of new business was resumed) to comply with the employer insurance company's reporting procedures; refusal to participate in a company campaign to solicit new business; reporting late at district offices the days the agents were scheduled to attend them; refusing to perform customary duties at the office, instead engaging there in "sit-in-mornings," "doing what comes naturally," and leaving at noon as a group; absenting themselves from special business conferences arranged by the company; picketing and distributing leaflets outside the various offices of the company on specified days and hours as directed by the union; distributing leaflets each day to policyholders and others and soliciting policyholders' signatures on petitions directed to the company; and presenting the signed policyholders' petitions to the company at its home office while simultaneously engaging in mass demonstrations there. 361 U. S., at 480–481. We held that such tactics would not support a finding by the NLRB that the union had failed to bargain in good faith as required by § 8 (b)(3) and rejected the *per se* rule applied by the Board that use of "economically harassing activities" alone sufficed to prove a vio-

lation of that section. The Court assumed "that the activities in question here were not 'protected' under § 7 of the Act," 361 U. S., at 483 n. 6, but held that the *per se* rule was beyond the authority of the NLRB to apply.

> "The scope of § 8(b)(3) and the limitations on Board power which were the design of § 8 (d) are exceeded, we hold, by inferring a lack of good faith not from any deficiencies of the union's performance at the bargaining table by reason of its attempted use of economic pressure, but solely and simply because tactics designed to exert economic pressure were employed during the course of the good-faith negotiations. Thus the Board in the guise of determining good or bad faith in negotiations could regulate what economic weapons a party might summon to its aid. And if the Board could regulate the choice of economic weapons that may be used as part of collective bargaining, it would be in a position to exercise considerable influence upon the substantive terms on which the parties contract. As the parties' own devices became more limited, the Government might have to enter even more directly into the negotiation of collective agreements. Our labor policy is not presently erected on a foundation of government control of the results of negotiations. See S. Rep. No. 105, 80th Cong., 1st Sess., p. 2. Nor does it contain a charter for the National Labor Relations Board to act at large in equalizing disparities of bargaining power between employer and union." *Id.*, at 490.

We noted further that "Congress has been rather specific when it has come to outlaw particular economic weapons on the part of unions" and "the activities here involved have never been specifically outlawed by Congress." *Id.*, at 498. Accordingly, the Board's claim "to power . . .

to distinguish among various economic pressure tactics and brand the ones at bar inconsistent with good-faith collective bargaining," *id.*, at 492, was simply inconsistent with the design of the federal scheme in which "the use of economic pressure by the parties to a labor dispute is . . . part and parcel of the process of collective bargaining." *Id.*, at 495.

The Court had earlier recognized in pre-emption cases that Congress meant to leave some activities unregulated and to be controlled by the free play of economic forces. *Garner* v. *Teamsters Union,* in finding pre-empted state power to restrict peaceful recognitional picketing, said:

> "The detailed prescription of a procedure for restraint of specified types of picketing would seem to imply that other picketing is to be free of other methods and sources of restraint. For the policy of the national Labor Management Relations Act is not to condemn all picketing but only that ascertained by its prescribed processes to fall within its prohibitions. Otherwise, it is implicit in the Act that the public interest is served by freedom of labor to use the weapon of picketing. For a state to impinge on the area of labor combat designed to be free is quite as much an obstruction of federal policy as if the state were to declare picketing free for purposes or by methods which the federal Act prohibits." 346 U. S., at 499–500.[5]

Moreover, *San Diego Unions* v. *Garmon* expressly recognized that "the Board may decide that an activity is neither protected nor prohibited, and thereby raise the

---

[5] It is true, of course, that the seeds of the *Garmon* "primary jurisdiction of the NLRB" approach to labor law pre-emption are also contained within the *Garner* opinion. See, in addition to the textual quotation, *Garner,* 346 U. S., at 490–491.

question whether such activity may be regulated by the States." 359 U. S., at 245.[6]

It is true, however, that many decisions fleshing out the concept of activities "protected" because Congress meant them to be "unrestricted by any governmental power to regulate," *Insurance Agents,* 361 U. S., at 488, involved review of *per se* NLRB rules applied in the regulation of the bargaining process. *E. g., NLRB* v. *American National Ins. Co.,* 343 U. S. 395 (1952); *NLRB* v. *Insurance Agents, supra; NLRB* v. *Drivers Local Union,* 362 U. S. 274 (1960); *NLRB* v. *Brown,* 380 U. S. 278 (1965); *American Ship Bldg. Co.* v. *NLRB,* 380 U. S. 300 (1965); cf. *NLRB* v. *Truck Drivers Union,* 353 U. S. 87 (1957); *H. K. Porter Co.* v. *NLRB,* 397 U. S. 99 (1970); *Florida Power & Light* v. *Electrical Workers,* 417 U. S. 790, 805 n. 16 (1974). But the analysis of *Garner* and *Insurance Agents* came full bloom in the pre-emption area in *Teamsters Union* v. *Morton,* 377 U. S. 252 (1964), which held pre-empted the application

---

[6] Although Mr. Justice Harlan took issue with the statement in *Garmon* that States may "be powerless to act when the underlying activities are clearly 'neither protected nor prohibited' by the federal Act," 359 U. S., at 253 (concurring in result), his later opinions make plain that the point of disagreement concerned the use of the term "protected" rather than the substantive concept.

"In the context of labor relations law, this word is fraught with ambiguity. 'Protected conduct' may, for example, refer to employee conduct which the States may not prohibit, . . . or to conduct against which the employer may not retaliate." *Railroad Trainmen* v. *Jacksonville Terminal Co.,* 394 U. S. 369, 382 n. 17 (1969). Indeed, Mr. Justice Harlan thereafter expressly adopted the *Garmon* formulation. *Hanna Mining* v. *Marine Engineers,* 382 U. S., at 187.

It has been suggested that rather than "protected," '[p]ermitted activities' would be better shorthand for this category of employee conduct because it may be—indeed is—protected against state, but not employer interference." Cox, *supra,* n. 4, at 1346 (footnote omitted).

of state law to award damages for peaceful union secondary picketing. Although *Morton* involved conduct neither "protected nor prohibited" by § 7 or § 8 of the NLRA, we recognized the necessity of an inquiry whether " 'Congress occupied this field and closed it to state regulation.' " 377 U. S., at 258. Central to *Morton's* analysis was the observation that "[i]n selecting which forms of economic pressure should be prohibited . . . , Congress struck the 'balance . . . between the uncontrolled power of management and labor to further their respective interests,' " *id.*, at 258–259,[7] and:

> "This weapon of self-help, permitted by federal law, formed an integral part of the petitioner's effort to achieve its bargaining goals during negotiations with the respondent. Allowing its use is a part of the balance struck by Congress between the conflicting interests of the union, the employees, the employer and the community. . . . If the Ohio law of secondary boycott can be applied to proscribe the same type of conduct which Congress focused upon but did not proscribe when it enacted § 303, the inevitable result would be to frustrate the congressional determination to leave this weapon of self-help available, and to upset the balance of power between labor and management expressed in our national labor policy. 'For a state to impinge on the area of labor combat designed to be free is quite as much an obstruction of federal policy as if the state were to declare picketing free for purposes or by methods which the federal Act

[7] "[T]he Taft-Hartley Act was, to a marked degree, the result of conflict and compromise between strong contending forces and deeply held views on the . . . appropriate balance to be struck between the uncontrolled power of management and labor to further their respective interests." *Carpenters Union* v. *NLRB*, 357 U. S. 93, 99–100 (1958).

prohibits.' *Garner* v. *Teamsters Union,* 346 U. S. 485, 500." *Id.,* at 259–260.

Although many of our past decisions concerning conduct left by Congress to the free play of economic forces address the question in the context of union and employee activities, self-help is of course also the prerogative of the employer because he, too, may properly employ economic weapons Congress meant to be unregulable. Mr. Justice Harlan concurring in *H. K. Porter Co.* v. *NLRB,* 397 U. S., at 109, stated the obvious:

> "[T]he Act as presently drawn does not contemplate that unions will always be secure and able to achieve agreement even when their economic position is weak, or that strikes and lockouts will never result from a bargaining impasse. It cannot be said that the Act forbids an employer . . . to rely ultimately on its economic strength to try to secure what it cannot obtain through bargaining."

"[R]esort to economic weapons should more peaceful measures not avail" is the right of the employer as well as the employee, *American Ship Bldg. Co.* v. *NLRB,* 380 U. S., at 317,[8] and the State may not prohibit the use of such weapons or "add to an employer's federal legal obligations in collective bargaining" any more than in the case of employees. Cox, *supra,* n. 4, at 1365. See, *e. g., Beasley* v. *Food Fair of North Carolina,* 416 U. S. 653 (1974). Whether self-help economic activities are employed by employer or union, the crucial inquiry regarding pre-emption is the same: whether "the exercise

---

[8] See also *NLRB* v. *Truck Drivers Union,* 353 U. S. 87, 96 (1957):

"Although the Act protects the right of the employees to strike in support of their demands, this protection is not so absolute as to deny self-help by employers when legitimate interests of employees and employers collide."

of plenary state authority to curtail or entirely prohibit self-help would frustrate effective implementation of the Act's processes." *Railroad Trainmen* v. *Jacksonville Terminal Co.*, 394 U. S., at 380.

## III

There is simply no question that the Act's processes would be frustrated in the instant case were the State's ruling permitted to stand. The employer in this case invoked the Wisconsin law because it was unable to overcome the Union tactic with its own economic self-help means.[9] Although it did employ economic weapons putting pressure on the Union when it terminated the pre-

---

[9] "Although Kearney and Trecker could have suspended, discharged, or even locked out its employees, such steps would have only increased its already enormous production problems [and] exacerbated the already substantial strain on the bargaining process . . . ." Brief for Respondent Kearney & Trecker Corp. 24 n. 36.

"Question: . . . [I]f you make the union fish or cut bait in the two extreme alternatives, . . . they may find they have to strike instead of engaging in some lesser activity like this. Doesn't the argument—the same argument can be made on the other side of the coin, it seems to me.

"Mr. Mallatt: Well, the union has two choices: It can accept the company's last proposal or it can strike, or it can continue to negotiate with the company and not make unilateral changes in the plant. You see, the employer can't do that, why should the union be able to do it? The employer can't pressure his employees if they are working after a contract has expired. He may lock them out.

"Question: Couldn't you unilaterally adopt a new overtime program?

"Mr. Mallatt: We never put it in.

"Question: But you tried to?

"Mr. Mallatt: That was a little pressure, but it didn't work.

"Question: I see." Tr. of Oral Arg. 35.

See also *id.*, at 25–26, 30–31, 33.

vious agreement, *supra*, at 134, it apparently lacked sufficient economic strength to secure its bargaining demands under "the balance of power between labor and management expressed in our national labor policy," *Teamsters Union* v. *Morton,* 377 U. S., at 260.[10]   But the economic weakness of the affected party cannot justify state aid contrary to federal law for, as we have developed, "the use of economic pressure by the parties to a labor dispute is not a grudging exception [under] . . . the [federal] Act; it is part and parcel of the process of collective bargaining." *Insurance Agents,* 361 U. S., at 495.   The state action in this case is not filling "a regulatory void which Congress plainly assumed would not exist," *Hanna Mining Co.* v. *Marine Engineers,* 382 U. S., at 196 (BRENNAN, J., concurring).   Rather, it is clear beyond question that Wisconsin "[entered] into the substantive aspects of the bargaining process to an extent Congress has not countenanced." *NLRB* v. *Insurance Agents, supra,* at 498.

Our decisions hold that Congress meant that these activities, whether of employer or employees, were not to be regulable by States any more than by the NLRB, for neither States nor the Board is "afforded flexibility in picking and choosing which economic devices of labor and management shall be branded as unlawful." *Ibid.* Rather, both are without authority to attempt to "intro-

---

[10] Cf. Cox, *supra,* n. 4, at 1347:

"[In *Briggs-Stratton,*] the Court was beguiled by the fallacy of supposing that a Congress which allowed an employer to discharge his employees for engaging in a series of 'quickie' strikes surely would not preclude the employer's pursuing what the Court regarded as the relatively mild sanction of legal redress through state courts. In fact, most employers facing a union with the strength and discipline to call a series of 'quickie' strikes would lack the economic power to discharge union members, leaving legal redress the more efficient sanction."

duce some standard of properly 'balanced' bargaining power," *id.,* at 497 (footnote omitted), or to define "what economic sanctions might be permitted negotiating parties in an 'ideal' or 'balanced' state of collective bargaining." *Id.,* at 500.[11] To sanction state regulation of such economic pressure deemed by the federal Act "desirabl[y] . . . left for the free play of contending economic forces, . . . is not merely [to fill] a gap [by] outlaw[ing] what federal law fails to outlaw; it is denying one party to an economic contest a weapon that Congress meant him to have available." Lesnick, Preemption Reconsidered: The Apparent Reaffirmation of *Garmon,* 72 Col. L. Rev. 469, 478 (1972).[12] Accordingly, such regulation by

---

[11] "It must be realized that collective bargaining, under a system where the Government does not attempt to control the results of negotiations, cannot be equated with an academic collective search for truth—or even with what might be thought to be the ideal of one. The parties—even granting the modification of views that may come from a realization of economic interdependence—still proceed from contrary and to an extent antagonistic viewpoints and concepts of self-interest. The system has not reached the ideal of the philosophic notion that perfect understanding among people would lead to perfect agreement among them on values. The presence of economic weapons in reserve, and their actual exercise on occasion by the parties, is part and parcel of the system that the Wagner and Taft-Hartley Acts have recognized. . . . [T]he truth of the matter is that at the present statutory stage of our national labor relations policy, the two factors—necessity for good-faith bargaining between parties, and the availability of economic pressure devices to each to make the other party incline to agree on one's terms—exist side by side. . . . Doubtless one factor influences the other; there may be less need to apply economic pressure if the areas of controversy have been defined through discussion; and at the same time, negotiation positions are apt to be weak or strong in accordance with the degree of economic power the parties possess." *Insurance Agents,* 361 U. S., at 488–489.

[12] In this case we need not and do not disturb the holding of *Briggs-Stratton,* later remarked in *Insurance Agents,* 361 U. S., at 494 n. 23, that § 13 of the NLRA, 29 U. S. C. § 163, which guarantees

the State is impermissible because it " 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " *Hill* v. *Florida,* 325 U. S. 538, 542 (1945).

## IV

There remains the question of the continuing vitality of *Briggs-Stratton*. *San Diego Unions* v. *Garmon,* 359 U. S., at 245 n. 4, made clear that the *Briggs-Stratton* approach to pre-emption is "no longer of general application." See also *Insurance Agents, supra,* at 493 n. 23. We hold today that the ruling of *Briggs-Stratton,* permitting state regulation of partial strike activities such as are involved in this case is likewise "no longer of general application." [13]

---

a qualified right to strike, is not an independent limitation on state power apart from its context in the structure of the Act. Nor need we determine the vitality of the implication in *Briggs-Stratton,* also remarked in *Insurance Agents, supra,* at 494 n. 23, that § 501 (2) of the Taft-Hartley amendments to the NLRA, 29 U. S. C. § 142 (2), is not to be considered in connection with § 13, but rather is only an aid to construction of § 8 (b)(4), 29 U. S. C. § 158 (b)(4), of the NLRA. We do note, however, that in determining the sense of the entire structure of the federal law respecting the use of economic pressure and the economic weapons assumed by Congress to be available to the parties, it is not insignificant that § 501 (2) in defining the term "strike" refers to the use of "any concerted slow-down or other concerted interruption of operations by employees." "It is hardly conceivable that such a word as 'strike' could have been defined in these statutes without congressional realization of the obvious scope of its application." *Insurance Agents, supra,* at 511 n. 6 (opinion of Frankfurter, J.).

[13] To the extent, however, that the holding in *Briggs-Stratton,* was premised on the Court's concern in that case with "evidence of considerable injury to property and intimidation of other employees by threats," 336 U. S., at 253, that decision remains vital as an unexceptional instance of our consistent recognition of the power of the States to regulate conduct physically injuring or threatening injury to persons or property. See *supra,* at 136, and n. 2.

*Briggs-Stratton* assumed "management . . . would be disabled from any kind of self-help to cope with these coercive tactics of the union" and could not "take any steps to resist or combat them without incurring the sanctions of the Act." 336 U. S., at 264. But as *Insurance Agents* held, where the union activity complained of is "protected," not because it is within § 7, but only because it is an activity Congress meant to leave unregulated, "the employer could have discharged or taken other appropriate disciplinary action against the employees participating." 361 U. S., at 493. Moreover, even were the activity presented in the instant case "protected" activity within the meaning of § 7,[14] eco-

---

[14] The assumption, *arguendo,* in *Insurance Agents* that the union activities involved were "unprotected" by § 7 reflected the fact that those activities included some bearing at least a resemblance to the "sit-down" strike held unprotected in *NLRB* v. *Fansteel Metallurgical Corp.,* 306 U. S. 240 (1939), and the "disloyal" activities held unprotected in *NLRB* v. *Electrical Workers,* 346 U. S. 464 (1953). See *Insurance Agents,* 361 U. S., at 492–494. The concerted refusal to work overtime presented in this case, however, is wholly free of such overtones.

It may be that case-by-case adjudication by the federal Board will ultimately result in the conclusion that some partial strike activities such as the concerted ban on overtime in the instant case, when unaccompanied by other aspects of conduct such as those present in *Insurance Agents* or those in *Briggs-Stratton* (overtones of threats and violence, 336 U. S., at 250 n. 8, and a refusal to specify bargaining demands, *id.,* at 249; see also *Insurance Agents, supra,* at 487, and n. 13), are "protected" activities within the meaning of § 7, although not so protected as to preclude the use of available countervailing economic weapons by the employer. See *Prince Lithograph Co.,* 205 N. L. R. B. 110 (1973). Compare *ibid.; Dow Chemical Co.,* 152 N. L. R. B. 1150 (1965), with *Decision, Inc.,* 166 N. L. R. B. 464, 479 (1967); *John S. Swift Co.,* 124 N. L. R. B. 394 (1959). See also *Polytech, Inc.,* 195 N. L. R. B. 695, 696 (1972). The Board in those cases placed emphasis on whether the decision to work overtime was voluntary with the individual in deciding whether a concerted refusal to work overtime is protected by

nomic weapons were available to counter the Union's refusal to work overtime, *e. g.,* a lockout, *American Ship Bldg. Co.* v. *NLRB,* 380 U. S. 300 (1965), and the hiring of permanent replacements under *NLRB* v. *Mackay Radio & Tel. Co.,* 304 U. S. 333 (1938). See *Prince Lithograph Co.,* 205 N. L. R. B. 110, 115 (1973); Cox, The Right to Engage in Concerted Activities, 26 Ind. L. J. 319, 339 (1951); Getman, The Protection of Economic Pressure by Section 7 of the National Labor Relations Act, 115 U. Pa. L. Rev. 1195, 1236 (1967).

Our decisions since *Briggs-Stratton* have made it abundantly clear that state attempts to influence the substantive terms of collective-bargaining agreements are as inconsistent with the federal regulatory scheme as are such attempts by the NLRB: "Since the federal law operates here, in an area where its authority is paramount, to leave the parties free, the inconsistent application of state law is necessarily outside the power of the State." *Teamsters Union* v. *Oliver,* 358 U. S. 283, 296 (1959). And indubitably regulation, whether federal or State, of "the choice of economic weapons that may be used as part of collective bargaining [exerts] considerable influence upon the substantive terms on which the parties contract." *NLRB* v. *Insurance Agents,* 361 U. S., at 490. The availability or not of economic weapons that federal law leaves the parties free to use cannot "depend upon the forum in which the [opponent] presses its claims." *Howard Johnson Co.* v. *Hotel Employees,* 417 U. S. 249, 256 (1974).[15]

§ 7. The parties in the instant case dispute the volitional nature of overtime prior to the concerted ban. In light of our disposition of the case we have no occasion to address the issue.

[15] "From [the decision in *Insurance Agents*] it would seem to follow a fortiori that state courts and agencies may not interject their standards of 'unjustifiable' or 'abusive' economic weapons into the context of a collective bargaining dispute." Michelman, State

Although we are not unmindful of the demands of *stare decisis* and the "important policy considerations militat[ing] in favor of continuity and predictability in the law," *Boys Markets, Inc.* v. *Retail Clerks,* 398 U. S. 235, 240 (1970), *Briggs-Stratton* "stands as a significant departure from our . . . emphasis upon the congressional policy" central to the statutory scheme it has enacted, and since our later decisions make plain that *Briggs-Stratton* "does not further but rather frustrates realization of an important goal of our national labor policy," *Boys Markets, supra,* at 241, *Briggs-Stratton* is expressly overruled. Its authority "has been 'so restricted by our later decisions' . . . that [it] must be regarded as having 'been worn away by the erosion of time' . . . and of contrary authority." *United States* v. *Raines,* 362 U. S. 17, 26 (1960).

V

This survey of the extent to which federal labor policy and the federal Act have pre-empted state regulatory authority to police the use by employees and employers of peaceful methods of putting economic pressure upon one another compels the conclusion that the judgment of the Wisconsin Supreme Court must be reversed. It is not contended, and on the record could not be contended, that the Union policy against overtime work was enforced by violence or threats of intimidation or injury to property. Workers simply left the plant at the end of their workshift and refused to volunteer for or accept overtime or Saturday work. In sustaining the order of the Wisconsin Commission, the Wisconsin Supreme Court relied on *Briggs-Stratton* as dispositive against the Union's claim of pre-emption, 67 Wis. 2d, at 19, 226

Power to Govern Concerted Employee Activities, 74 Harv. L. Rev. 641, 669 (1961).

N. W. 2d, at 206. The court held further that the refusal to work overtime was neither arguably protected under § 7 nor arguably prohibited under § 8 of the federal Act, *id.,* at 23–24, 226 N. W. 2d, at 208, an analysis which, as developed, is largely inapplicable to the circumstances of this case. *NLRB* v. *Insurance Agents* was distinguished on the ground that that case dealt only with NLRB power "to regulate . . . strike tactics" and left such "regulation . . . to the states." 67 Wis. 2d, at 22, 226 N. W. 2d, at 207. Finally, the court rejected the Union's argument relying on *Teamsters Union* v. *Morton* that the refusal to work overtime was affirmatively "permitted" under federal law, stating: "Congress has not 'focused upon' partial . . . strikes," and therefore "[p]olicing of such conduct is left wholly to the states." 67 Wis. 2d, at 26, 226 N. W. 2d, at 209.

Since *Briggs-Stratton* is today overruled, and as we hold further that the Union's refusal to work overtime is peaceful conduct constituting activity which must be free of regulation by the States if the congressional intent in enacting the comprehensive federal law of labor relations is not to be frustrated, the judgment of the Wisconsin Supreme Court is

*Reversed.*

MR. JUSTICE POWELL, with whom THE CHIEF JUSTICE joins, concurring.

The Court correctly identifies the critical inquiry with respect to pre-emption as whether "the exercise of plenary state authority to curtail or entirely prohibit self-help would frustrate effective implementation of the Act's processes." *Railroad Trainmen* v. *Jacksonville Terminal Co.,* 394 U. S. 369, 380 (1969). See *ante,* at 147–148.

This is equally true whether the self-help activities

are those of the employer or the Union. I agree with the Court that the Wisconsin law, as applied in this case, is pre-empted since it directly curtails the self-help capability of the Union and its members, resulting in a significant shift in the balance of free economic bargaining power struck by Congress. I write to make clear my understanding that the Court's opinion does not, however, preclude the States from enforcing, in the context of a labor dispute, "neutral" state statutes or rules of decision: state laws that are not directed toward altering the bargaining positions of employers or unions but which may have an incidental effect on relative bargaining strength. Except where Congress has specifically provided otherwise, the States generally should remain free to enforce, for example, their law of torts or of contracts, and other laws reflecting neutral public policy.* See Cox, Labor Law Preemption Revisited, 85 Harv. L. Rev. 1337, 1355–1356 (1972).

With this understanding, I join the opinion of the Court.

MR. JUSTICE STEVENS, with whom MR. JUSTICE STEWART and MR. JUSTICE REHNQUIST join, dissenting.

If the partial strike activity in this case were protected, or even arguably protected, by § 7 of the National Labor Relations Act, the Court's conclusion would be supported by *San Diego Unions* v. *Garmon,* 359 U. S. 236. But in *Automobile Workers* v. *Wisconsin Emp. Rel. Board,* 336 U. S. 245 (*Briggs-Stratton*), the Court rejected the argument that comparable activity was protected by § 7. And as I understand the Court's holding today, it as-

---

*State laws should not be regarded as neutral if they reflect an accommodation of the special interests of employers, unions, or the public in areas such as employee self-organization, labor disputes, or collective bargaining.

sumes that this activity remains unprotected.[1] Moreover, if such activity were prohibited, or arguably prohibited, by § 8 of the Act, the Court's conclusion would also be supported by *Garmon*. But ever since *NLRB* v. *Insurance Agents*, 361 U. S. 477, it has been clear that this activity is not even arguably prohibited.

If Congress had focused on the problems presented by partial strike activity, and had enacted special legislation dealing with this subject matter, but left the form of the activity disclosed by this record unregulated, the Court's conclusion would be supported by *Teamsters Union* v. *Morton*, 377 U. S. 252. But this is not such a case. Despite the numerous statements in the Court's opinion about Congress' intent to leave partial strike activity wholly unregulated, I have found no legislative expression of any such intent nor any evidence that Congress has scrutinized such activity.[2]

---

[1] I recognize that there is some ambiguity in the Court's discussion, *ante*, at 152–153, which first implies that the employer may take any appropriate disciplinary action, including discharge, since the union activity is unprotected by § 7, and then immediately casts doubt on this assurance to the employer by indicating that some economic weapons may be used in reprisal even if the activity is protected. The ambiguity of the Court's rationale is inconsistent with its assumption that the employer is wholly free to use economic self-help without fear of committing an unfair labor practice. In all events, while I recognize that I may be misreading the Court's opinion, I assume that its holding rests on the predicate that the concerted refusal to work overtime in this case, like the partial strike activity in *Briggs-Stratton*, is unprotected by § 7.

[2] A scholar who has criticized *Briggs-Stratton* has observed: "The omission of a federal prohibition against 'quickie' strikes certainly could not have implied a desire that unions be free to embrace the tactic without restraint; congressional silence almost surely is attributable to the happy circumstance that no prohibition is urgently required because American labor unions have almost unanimously

If this Court had previously *held* that the no-man's land in which conduct is neither arguably protected nor arguably prohibited by federal law is nevertheless preempted by an unexpressed legislative intent, I would follow such a holding. But none of the cases reviewed in the Court's opinion so holds.[3] Ever since 1949, when *Briggs-Stratton* was decided, the rule has been that partial strike activity within that area may be regulated by the States.

If adherence to the rule of *Briggs-Stratton* would per-

---

rejected such tactics." Cox, Labor Law Preemption Revisited, 85 Harv. L. Rev. 1337, 1347 (1972).

The Union argues that Congress focused upon partial strike activity during passage of the Taft-Hartley Act, 61 Stat. 136, relying upon a provision passed by the House, but rejected in the Conference Committee, that declared unlawful "any sit-down strike or other concerted interference with an employer's operations conducted by remaining on the employer's premises." H. R. 3020, 80th Cong., 1st Sess., § 12 (a) (3) (A) (1947). See H. R. Rep. No. 245, 80th Cong., 1st Sess., 27–28, 43–44 (1947); H. R. Conf. Rep. No. 510, 80th Cong., 1st Sess., 38–39, 42–43, 58–59 (1947). The concerted refusal to work overtime in this case does not involve "concerted interference with an employer's operations conducted by remaining on the employer's premises."

[3] In *NLRB* v. *Insurance Agents*, 361 U. S. 477, the Court held that the partial strike activity in that case did not violate the union's duty to bargain in good faith; in other words, even though the activity was not protected by § 7, it was not prohibited by § 8. Contrary to the Court's implication, *ante*, at 141, the case did not hold that the States could not prohibit such activity, but only that the NLRB had not been authorized to do so. Congress' failure to grant power over such activity to the NLRB hardly amounts to withdrawal of the same power from the States.

The Court's quotation, *ibid.*, from *Hanna Mining Co.* v. *Marine Engineers*, 382 U. S. 181, 187, when read in context, is nothing more than a reference to a statement in *San Diego Unions* v. *Garmon*, 359 U. S. 236, which poses, but does not answer, the question whether pre-emption extends to activity that is neither arguably protected nor arguably prohibited.

mit the States substantially to disrupt the balance Congress has struck between union and employer, I would readily join in overruling it. But I am not persuaded that partial strike activity is so essential to the bargaining process that the States should not be free to make it illegal.[4]

Stability and predictability in the law are enhanced when the Court resists the temptation to overrule its prior decisions.[5] It is particularly inappropriate to do so when the Court is purporting to implement the intent of Congress with respect to an issue that Congress has yet to address. *Edelman* v. *Jordan,* 415 U. S. 651, 671 n. 14. Finally, I am not nearly as sanguine as the Court about the likelihood that this decision will clarify or harmonize a fairly confused area of the law. In sum, I would adhere to prior precedent which is directly in point.

---

[4] See n. 2, *supra.*

[5] I cannot agree with the Court's conclusion that the holding in *Briggs-Stratton,* overruled today, numbers among those that have been eroded rather than preserved. See *ante,* at 151–154, and n. 12. The decision in *Insurance Agents, supra,* is readily distinguishable. See n. 3, *supra.* It is true that *Briggs-Stratton* has been limited to its facts insofar as it sanctions judicial determination whether conduct arguably protected by § 7 or prohibited by § 8 is actually protected or prohibited. *Motor Coach Employees* v. *Lockridge,* 403 U. S. 274, 291; *San Diego Unions* v. *Garmon, supra,* at 245 n. 4; see *Insurance Agents, supra,* at 492–494, and nn. 22, 23. But the rule established in *Garmon,* and reaffirmed in *Lockridge,* is fully consistent with the conclusion that the States may regulate conduct that is neither arguably protected nor arguably prohibited.