Justice Breyer, with whom Justice Ginsburg
joins, dissenting.
California’s spending statute sets forth a state “policy” not to “subsidize efforts by an employer to assist, promote, or deter union organizing.” 2000 Cal. Stats, ch. 872, §1. The operative sections of the law prohibit several classes of em *77 ployers who receive state funds from using those funds to “assist, promote, or deter union organizing.” Cal. Govt. Code Ann. §§ 16645-16649 (West Supp. 2008). And various compliance provisions then require maintenance of “records sufficient to show that no state funds were used” for prohibited expenditures, deter the use of commingled funds for prohibited expenditures, and impose serious penalties upon violators. §§ 16645.2(c), 16645.7(b)-(c).
The Court finds that the National Labor Relations Act (NLRA) pre-empts these provisions. It does so, for it believes the provisions “regulate” activity that Congress has intended to “be unregulated because left to be controlled by the free play of economic forces.” Machinists v. Wisconsin Employment Relations Comm'n, 427 U. S. 132, 140 (1976) (internal quotation marks omitted; emphasis added). The Chamber of Commerce adds that the NLRA pre-empts these provisions because they “regulate activity that the NLRA protects, prohibits, or arguably protects or prohibits.” Wisconsin Dept. of Industry v. Gould Inc., 475 U. S. 282, 286 (1986) (summarizing the pre-emption principle set forth in San Diego Building Trades Council v. Garmon, 359 U. S. 236 (1959); emphasis added). Thus the question before us is whether California’s spending limitations amount to regulation that the NLRA pre-empts. In my view, they do not.
I
The operative sections of the California statute provide that employers who wish to “assist, promote, or deter union organizing” cannot use state money when they do so. The majority finds these provisions pre-empted because in its view the sections regulate employer speech in a manner that weakens, or undercuts, a congressional policy, embodied in NLRA § 8(c), “ ‘to encourage free debate on issues dividing labor and management.’ ” Ante, at 67 (quoting Linn v. Plant Guard Workers, 383 U. S. 53, 62 (1966)).
*78 Although I agree the congressional policy favors “free debate,” I do not believe the operative provisions of the California statute amount to impermissible regulation that interferes with that policy as Congress intended it. First, the only relevant Supreme Court case that found a State’s labor-related spending limitations to be pre-empted differs radically from the case before us. In that case, Wisconsin Dept. of Industry v. Gould Inc., 475 U. S. 282, the Court considered a Wisconsin statute that prohibited the State from doing business with firms that repeatedly violated the NLRA. The Court said that the statute’s “manifest purpose and inevitable effect” was “to enforce” the NLRA’s requirements, which “role Congress reserved exclusively for the [National Labor Relations Board].” Id., at 291. In a word, the Wisconsin statute sought “to compel conformity with the NLRA.” Building & Constr. Trades Council v. Associated Builders & Contractors of Mass./R. I., Inc., 507 U. S. 218, 228 (1993) (emphasis added).
California’s statute differs from the Wisconsin statute because it does not seek to compel labor-related activity. Nor does it seek to forbid labor-related activity. It permits all employers who receive state funds to “assist, promote, or deter union organizing.” It simply says to those employers, do not do so on our dime. I concede that a federal law that forces States to pay for labor-related speech from public funds would encourage more of that speech. But no one can claim that the NLRA is such a law. And without such a law, a State’s refusal to pay for labor-related speech does not impermissibly discourage that activity. To refuse to pay for an activity (as here) is not the same as to compel others to engage in that activity (as in Gould).
Second, California’s operative language does not weaken or undercut Congress’ policy of “encouraging] free debate on issues dividing labor and management.” Linn, supra, at 62. For one thing, employers remain free to spend their own money to “assist, promote, or deter” unionization. More im *79 portantly, I cannot conclude that California’s statute would weaken or undercut any such congressional policy because Congress itself has enacted three statutes that, using identical language, do precisely the same thing. Congress has forbidden recipients of Head Start funds to use the funds to “assist, promote, or deter union organizing.” 42 U. S. C. § 9839(e). It has forbidden recipients of Workforce Investment Act of 1998 funds to use the funds to “assist, promote, or deter union organizing.” 29 U. S. C. § 2931(b)(7). And it has forbidden recipients of National Community Service Act of 1990 funds to use the funds to “assist, promote, or deter union organizing.” 42 U. S. C. § 12634(b)(1). Could Congress have thought that the NLRA would prevent the States from enacting the very same kinds of laws that Congress itself has enacted? Far more likely, Congress thought that directing government funds away from labor-related activity was consistent, not inconsistent, with the policy of “encouraging] free debate” embedded in its labor statutes.
Finally, the law normally gives legislatures broad authority to decide how to spend the people’s money. A legislature, after all, generally has the right not to fund activities that it would prefer not to fund—even where the activities are otherwise protected. See, e. g., Regan v. Taxation With Representation of Wash., 461 U. S. 540, 549 (1983) (“We have held in several contexts that a legislature’s decision not to subsidize the exercise of a fundamental right does not infringe the right”). This Court has made the same point in the context of labor law. See Lyng v. Automobile Workers, 485 U. S. 360, 368 (1988) (holding that the Federal Government’s refusal to provide food stamp benefits to striking workers was justified because “[strikers and their union would be much better off if food stamps were available,” but the “strikers’ right of association does not require the Government to furnish funds to maximize the exercise of that right”).
*80 As far as I can tell, States that do wish to pay for employer speech are generally free to do so. They might make clear, for example, through grant-related rules and regulations that a grant recipient can use the funds to pay salaries and overhead, which salaries and overhead might include expenditures related to management’s role in labor organizing contests. If so, why should States that do not wish to pay be deprived of a similar freedom? Why should they be conscripted into paying?
I can find nothing in the majority’s arguments that convincingly answers these questions. The majority says that California must be acting as an impermissible regulator because it is not acting as a “market participant” (a role we all agree would permit it broad leeway to act like private firms in respect to labor matters). Ante, at 70. But the regulator/market-participant distinction suggests a false dichotomy. The converse of “market participant” is not necessarily “regulator.” A State may appropriate funds without either participating in or regulating the labor market. And the NLRA pre-empts a State’s actions, when taken as an “appropriator,” only if those actions amount to impermissible regulation. I have explained why I believe that California’s actions do not amount to impermissible regulation here.
The majority also complains that the statute “imposes a targeted negative restriction,” one applicable only to labor. Ante, at 71. I do not find this a fatal objection, because the congressional statutes just discussed (which I believe are consistent with the NLRA) do exactly the same. In any event, if, say, a State can tell employers not to use state funds to pay for a large category of expenses (say, overhead), why can it not tell employers the same about a smaller category of expenses (say, only those overhead expenses related to taking sides in a labor contest). And where would the line then be drawn? Would the statute pass muster if California had said, do not use our money to pay for interior decorating, catered lunches, or labor relations?
*81 The majority further objects to the fact that the statute does not “apply” the constraint “uniformly,” because it permits use of state funds for “select employer advocacy activities that promote unions.” Ante, at 71. That last phrase presumably refers to an exception in the California statute that permits employers to spend state funds to negotiate a voluntary recognition of a union. But this exception underscores California’s basic purpose — maintaining a position of spending neutrality on contested labor matters. Where labor and management agree on unionization, there is no conflict.
II
I turn now to the statute’s compliance provisions. They require grant recipients to maintain “records sufficient to show that no state funds were used” for prohibited expenditures; they deter the use of commingled ñmds for prohibited expenditures; and they impose serious penalties upon violators. Cal. Govt. Code Ann. §§ 16645.2(c), 16645.7(b)-(e). The majority seems to rest its conclusions in part upon its belief that these requirements are too strict, that, under the guise of neutral enforcement, they discourage the use of non-state money to engage in free debate on labor/management issues. Ante, at 71.
I agree with the majority that, should the compliance provisions, as a practical matter, unreasonably discourage expenditure of nonstate funds, the NLRA may well pre-empt California’s statute. But I cannot say on the basis of the record before us that the statute will have that effect.
The language of the statute is clear. The statute requires recipients of state money to “maintain records sufficient to show that no state funds were used” for prohibited expenditures. §§ 16645.2, 16645.7(c). And the class of prohibited expenditures is quite broad: It covers “any expense” incurred in “any attempt” by an employer to “influence the decision of its employees,” including “legal and consulting fees and salaries of supervisors and employees” incurred *82 during research for or the preparation, planning, coordination, or execution of activities to “assist, promote, or deter” union organizing. § 16646(a) (emphasis added). And where an employer mingles state funds and nonstate funds (say, to pay a particular employee who spends part of her time dealing with unionization matters) the employer must determine “on a pro rata basis,” the portion of the labor-related expenditure paid for by state funds, and maintain sufficient supporting documentation. § 16646(b). Any violation of these provisions is then subject to strict penalties, including treble damages and attorney’s fees and costs. § 16645.8.
What is less clear is the degree to which these provisions actually will deter a recipient of state funds from using non-state funds to engage in unionization matters. And no lower court has ruled on this matter. In the District Court, the Chamber of Commerce moved for summary judgment arguing that the statute, by placing restrictions on state funds, was pre-empted by Machinists and Garmon and also arguing that the compliance provisions are so burdensome that they would chill even private expenditures. California opposed the motion. And California submitted expert evidence designed to show that its “accounting and recordkeeping requirements . .. are similar to requirements imposed in other contexts,” are “significantly less burdensome than the detailed requirements for federal grant recipients,” and allow “flexibility in establishing proper accounting procedures and controls.” App. 282-283.
The District Court granted the Chamber of Commerce’s motion for summary judgment in part, finding that the operative sections of the statute were pre-empted for the reasons I have discussed in Part I, namely, that the operative provisions interfered with the NLRA’s policy of encouraging “free debate.” 225 F. Supp. 2d 1199, 1204 (CD Cal. 2002). But in doing so, it did not address the Chamber of Commerce’s argument that the California statute’s compliance provisions affected non-state-funded speech to the point that the NLRA *83 pre-empted the statute. Neither did the Court of Appeals address the question whether the compliance provisions themselves constitute sufficient grounds for finding the statute pre-empted.
I do not believe that we can, and I would not, decide this question until the lower courts have had an opportunity to consider and rule upon the compliance-related questions. Accordingly, I would vote to vacate the judgment of the Ninth Circuit and remand for further proceedings on this issue.
I respectfully dissent.