**BOISE CASCADE CORPORATION, a Delaware corporation, BE & K Construction Company, a Delaware corporation, Charles L. Lee, Relco Unisystems Corporation, a Minnesota corporation, Forrest Dahmes, Mid–State Mechanical Services, Inc., a Minnesota corporation, Kristine Southard, Plaintiffs,**

**v.**

**Kenneth PETERSON, Commissioner of the Department of Labor and Industry, State of Minnesota, Defendant.**

**and**

**Minnesota Mechanical Contractors Association, Inc. Intervenor.**

**Civ. No. 4–90–48.**

United States District Court, D. Minnesota, Fourth Division.

April 27, 1990.

David P. Pearson, Lloyd W. Grooms, Winthrop & Weinstine, St. Paul, Minn., for plaintiffs Boise Cascade Corp., BE & K Const. Co. and Charles L. Lee.

Lowell J. Noteboom, Robert P. Thavis, Leonard, Street & Deinard, Minneapolis, Minn., for plaintiffs Relco Unisystems Corp., Forrest Dahmes, Mid–States Mechanical Services, Inc. and Kristine Southard.

Hubert H. Humphrey, III, Minnesota Atty. Gen., and Scott R. Strand, Asst. Atty. Gen., St. Paul, for defendant.

Marshall H. Tanick, Teresa J. Ayling, Mansfield & Tanick, Minneapolis, Minn., for intervenor.

## MEMORANDUM AND ORDER

MacLAUGHLIN, District Judge.

Plaintiffs have filed suit to enjoin implementation of a state administrative rule mandating a specific minimum ratio of licensed journeymen pipefitters for each apprentice pipefitter at all jobsites where high pressure pipefitting is being performed.[1] Plaintiffs argue that the rule is preempted both by the Employee Retirement Income Security Act (ERISA) and the National Labor Relations Act (NLRA). On the motion of the plaintiffs, the Court issued a temporary restraining order which enjoined the defendant from implementing or enforcing the new rule. The case was subsequently referred to the United States Magistrate for a report and recommendation on plaintiff's motion for preliminary and permanent injunctive relief as well as

---

1. The rule requires that the first unlicensed apprentice on a high pressure pipefitting jobsite be accompanied by at least one licensed pipefitter and that there be at least three licensed pipefitters for every unlicensed apprentice after the first. The full text of the rule is as follows:

All persons learning the trade of pipefitting shall be under the direct supervision of a contracting or journeyman pipefitter. The minimum ratio of pipefitter trainees to licensed pipefitters on the jobsite shall be:

A. One pipefitter trainee for the first licensed pipefitter; and
B. One pipefitter trainee for every three licensed pipefitters after that;
provided that at least one journeyman or contracting pipefitter must be on the jobsite at all times when work is in process.
Minn.Rules Pt. 5230.0110, subp. 2a.

defendant's motion for summary judgment. In his March 30, 1990 report and recommendation, the Magistrate recommended that the Court deny plaintiff's motions for injunctive relief and grant defendant's motion for summary judgment. Plaintiffs' objections to the report and recommendation are now before the Court.

FACTS

Beginning in 1937, Minnesota has regulated high pressure pipefitting, formerly known as steamfitting. *See* Minn.Stat. §§ 326.46–.52 and Minn.Rules Pt. 5230. The regulatory scheme includes both an extensive technical code establishing minimum requirements for the design, testing and installation of high pressure piping and provisions for the licensing of pipefitters.

There are two types of pipefitter licenses. "Contracting steamfitters" are qualified to plan and oversee the installation of high pressure pipefitting and to employ journeymen steamfitters. Minn.Rules Pt. 5230.0040, subpt. 1 and Pt. 5230.0070. "Journeymen steamfitters" may install high pressure piping in the employ of a contracting steamfitter. Minn.Rules Pt. 5230.0040, subpt. 3. The rules also provide for unlicensed apprentices[2] who work under the supervision of licensed pipefitters. Minn.Rules Pt. 5230.0040, subpt. 4. Apprentices must either be registered with the Code Enforcement Division or enrolled in an apprenticeship training program recognized by the Division of Voluntary Apprenticeship.[3] Minn.Rules Pt. 5230.0110, subpt. 1.

The Division of Voluntary Apprenticeship approves only those programs that meet certain minimum standards. As early as 1946 these standards included a minimum ratio of journeymen to apprentices.

Since 1973, the standards have called for no more than one apprentice for the first journeyman plus one additional apprentice for each additional three journeymen.[4] Affidavit of Robert L. Wickland, ¶ 8, Exh. C. The standards also require four years of education at a vocational-technical institute. Affidavit of Lloyd W. Grooms, Exh. 6 (Report of the Administrative Law Judge) at 6. While the terms of the collective bargaining agreements with pipefitter unions vary slightly, the parties agree that the agreements generally require the same 3–to–1 ratio.[5] It is no coincidence then that, although any employer can establish state-recognized voluntary apprenticeship programs, so far all such programs have been established by union employers or unions. Grooms Aff. Exh. 6 at 7.

Some non-union employers have established their own pipefitter apprenticeship programs outside the aegis of the Division of Voluntary Apprenticeship. These programs are less formal than the state-recognized programs, but do offer class work to complement the apprentice's on-the-job training. Grooms Aff. Exh. 6 at 8; Affidavit of W. Douglas Cross ¶ 7; Affidavit of Kent Durenberger Exh. 1. These programs do not have any fixed ratio of journeymen to apprentices. *See* Cross Aff. ¶ 3; Affidavit of Loren Cole ¶ 3; Durenberger Aff. at 3. The ratio of journeymen to apprentices at any particular jobsite is determined by the complexity of the task at hand and the experience and ability of the particular individuals available. The ratio of journeymen to apprentices in nonunion training programs tends to be substantially below three-to-one. Grooms Aff. Exh. 6 at 8.

---

**2.** The amended rules refer to apprentices as "pipefitter trainees."

**3.** A person must have four years of experience in the pipefitting trade and pass an examination in order to be licensed as a journeyman pipefitter. Minn.Rules Pt. 5230.0080. The experience requirement may be met as an apprentice in Minnesota or through pipefitting work done in another state. Affidavit of B. James Berg ¶ 4.

**4.** Requests for a variance from this ration requirement are considered "on an individual basis." Affidavit of Robert L. Wickland ¶ 8.

**5.** Plaintiff Boise Cascade has an agreement with the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, Local No. 771 which provides that the terms and conditions of the apprenticeship program will be established through future bargaining. Affidavit of Bob Anderson Exh. C at UA–Ex. B–1.

An employer who hires apprentice pipefitters need not establish an apprentice training program. Minnesota requires only that the apprentices be registered with the Code Enforcement Division and that they be ready to take the test, through their own study or employer-sponsored instruction, after four years of experience in the pipefitting trade. Minn.Rule Pt. 5230.0110, subpt. 1.

Until 1985–86, almost all pipefitter apprentices participated in voluntary apprenticeship programs where the ratio of journeymen to apprentices was at least 3-to-1. Grooms Aff. Exh. 6 at 9. That changed in the last several years as non-union employers began establishing apprenticeship training programs which did not comply with the voluntary apprenticeship program's standards.[6] The Department of Labor and Industry ultimately came to question whether pipefitter apprentices were working under adequate supervision. Grooms Aff. Exh. 6 at 9.

On May 16, 1988, the Commissioner of Labor and Industry initiated rulemaking procedures by soliciting information and opinions in conjunction with efforts to prepare an amendment to the rules governing high pressure piping. 12 State Register 2518. On June 12, 1989, the department published a proposed rule requiring the same ratio of journeymen to apprentices eventually adopted. 13 State Register 2928. The rule will hereinafter be referred to as the 3-to-1 rule.[7] Because a sufficient number of requests for a hearing were received, the proposed rule was republished on August 21, 1989 with notice of a hearing one month later.[8] 14 State Register 357.

After the hearing, and based upon the entire record developed during the course of rulemaking proceedings, the Administrative Law Judge (ALJ) found that the agency had demonstrated a need for the proposed rule and that the rule was rationally related to its ends. The rule was adopted on January 22, 1990. 14 State Register 1878.

The rule was found to be necessary and reasonable because of the danger posed by improperly installed high pressure piping and the department's substantiated concerns about the adequacy of the training and supervision received by apprentices at non-union shops. Grooms Aff. Exh. 6 ¶¶ 15–17, 27. The state cannot observe all high pressure pipefitting work as it is being done. Inspectors do make inspections both during and after construction, but once a pipefitting job is completed much of the work is no longer visible. Grooms Aff. Exh. 6 ¶ 25; Affidavit of Charles Fritze, Jr. ¶ 5. Defects may go undetected until the piping ruptures or explodes. Grooms Aff. Exh. 6 ¶ 16–17, 33; Fritze Aff. ¶ 5. The 3-to-1 rule is intended, not just to assure that apprentice pipefitters receive adequate training, but also to assure that high pressure piping is safely installed by either licensed pipefitters or adequately supervised apprentices. Grooms Aff. Exh. 6 ¶ 27, 44. The department's decision to adopt a 3-to-1 ratio was found to be supported by past experience with that rule in the pipefitting trade. *Id.* at ¶¶ 29–33, 44.

Plaintiffs allege that the 3-to-1 rule is preempted by ERISA and/or the NLRA. As mentioned earlier, the Magistrate analyzed these claims and recommended that

---

**6.** For example, plaintiff Relco Unisystems Corporation employs one contracting pipefitter, two journeymen pipefitters and twenty apprentices. Cole Aff. ¶ 2. Plaintiff Mid–States Mechanical Services employs one contracting pipefitter, one journeyman pipefitter and nine apprentices. Durenberger Aff. ¶ 2. BE & K employs approximately ten licensed pipefitters and twenty apprentices at the Boise Cascade expansion project. Cross Aff. ¶ 8.

**7.** The rule in fact allows one apprentice for the first journeyman pipefitter and then one additional apprentice for every three journeymen. See footnote one for the text of the rule.

**8.** This was shortly after the inception of a labor dispute concerning the $535 million expansion of Boise Cascade's manufacturing facility in International Falls, Minnesota. Boise Cascade hired BE & K as the general contractor for the project. Labor organizations have protested this choice because BE & K is a non-union contractor.

While plaintiffs concede that the motivation for the rule is irrelevant to the legal questions presented by their suit, the claim that the rule is merely a means through which the state has sought to interfere in their labor dispute underlies their argument.

the Court grant summary judgment in favor of the defendant.

DISCUSSION

## I. ERISA Preemption

The Employee Retirement Income Security Act (ERISA) of 1974 is a comprehensive remedial statute designed to protect "the continued well-being and security of the millions of employees and their dependents ... directly affected by" employee benefit plans. 29 U.S.C. § 1001(a). The statute protects these interests through substantive requirements imposed upon pension plans relating to participation, funding and vesting, and also through uniform procedural standards governing reporting, disclosure and fiduciary responsibilities for both pension and welfare benefit plans. *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 91, 103 S.Ct. 2890, 2896, 77 L.Ed.2d 490 (1983). The statute also contains a broad preemption provision intended to "round out the protection afforded participants by eliminating the threat of conflicting and inconsistent State and local regulation." Statement of Representative Dent, 120 Cong.Rec. 29197, *quoted in Fort Halifax Packaging Co. v. Coyne,* 482 U.S. 1, 107 S.Ct. 2211, 2216, 96 L.Ed.2d 1 (1987).

ERISA's preemption provision is section 514(a), codified at 29 U.S.C. § 1144(a). It states:

> Except as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chapter *shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan* described in section 1003(a) of this title and not exempt under section 1003(b) of this title.

(Emphasis added.) Section 514(b) excludes specified types of state laws, primarily insurance, banking, and securities laws, from the preemption clause.

By making the regulation of employee benefit plans exclusively federal, Congress intended to provide for the efficient, uniform administration of those plans.

An employer that makes a commitment systematically to pay certain benefits undertakes a host of obligations, such as determining the eligibility of claimants, calculating benefit levels, making disbursements, monitoring the availability of funds for benefit payments, and keeping appropriate records in order to comply with applicable reporting requirements. The most efficient way to meet these responsibilities is to establish a uniform administrative scheme, which provides a set of standard procedures to guide processing of claims and disbursement of benefits. Such a system is difficult to achieve, however, if a benefit plan is subject to differing regulatory requirements in differing States. A plan would be required to keep certain records in some States but not in others; to make certain benefits available in some States but not in others; to process claims in a certain way in some States but not in others; and to comply with certain fiduciary standards in some States but not in others.

*Fort Halifax,* 107 S.Ct. at 2216.

ERISA specifically defines employee welfare benefit plans to include any "plan, fund or program" established or maintained by an employer or employee organization or both for the purpose of providing participants with "apprenticeship or other training programs." 29 U.S.C. § 1002(1). For the purposes of this motion, defendant concedes that plaintiffs' pipefitter apprenticeship programs are employee welfare benefit plans as defined by ERISA. March 30, 1990 Report and Recommendation at 9.

■ The 3–to–1 rule is preempted if, under section 514(a), it "relates to" an employee benefit plan. This preemption provision has a broad scope, not limited to laws specifically designed to affect employee benefit plans. A state law "relates to" employee benefit plan "in the normal sense of the phrase, if it has a connection with or reference to such a plan." *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 96–97, 103 S.Ct. 2890, 2899–2900, 77 L.Ed.2d 490 (1983); *see also Baxter v. Lynn,* 886 F.2d 182, 185 (8th Cir.1988). The limits of section 514(a)'s scope has often been litigated

but is not yet clearly defined. It is nevertheless certain that the statute does not preempt all state laws which affect employee benefit plans. *See, e.g., Mackey v. Lanier Collections Agency & Service,* 108 S.Ct. 2182, 2185–91 (1988) (generally applicable garnishment law under which creditors can garnish ERISA welfare benefits); *Fort Halifax,* 107 S.Ct. 2211 (law requiring companies to make lump-sum severance payments when closing a plant); *Aetna Life Insurance Co. v. Borges,* 869 F.2d 142 (2d Cir.) (state escheat law which has administrative and economic impact on ERISA plans because it forced the plans to pay unclaimed benefits to the state), *cert. denied,* —— U.S. ——, 110 S.Ct. 57, 107 L.Ed.2d 25 (1989); *Firestone Tire & Rubber Co. v. Neusser,* 810 F.2d 550 (6th Cir. 1987) (city income tax of general application that affects employee contributions to benefit plans); *Rebaldo v. Cuomo,* 749 F.2d 133 (2d Cir.1984) (law prescribing what hospitals can charge for inpatient care, thereby preventing benefit plans from negotiating their own discount rates), *cert. denied,* 472 U.S. 1008, 105 S.Ct. 2702, 86 L.Ed.2d 718 (1985). Moreover, where section 514(a) may encroach on areas of traditional state regulation the Supreme Court has held that interpretation of that section "must be guided by respect for the separate spheres of governmental authority preserved in our federalist system." *Alessi v. Raybestos–Manhattan, Inc.,* 451 U.S. 504, 522, 101 S.Ct. 1895, 1905, 68 L.Ed.2d 402 (1981).

▆ The 3–to–1 rule at issue here presents an interesting question concerning the states' ability, in light of section 514(a), to regulate two related areas traditionally reserved to the states—occupational training and public safety. The 3–to–1 rule is an effort by Minnesota to regulate the training of apprentice pipefitters and will necessarily affect pipefitter training programs. The rule also constitutes an effort by the state to assure that high pressure piping is installed safely. It is a law of general application which applies to any jobsite where high pressure pipefitting is done. It does not require any employers to create or fund an ERISA plan nor does it

affect any other primary administrative functions regulated by ERISA. Nevertheless, it does limit the numbers of persons who can participate in plaintiffs' ERISA plans and, to some extent, it determines the manner in which those plans deliver benefits.

In *Fort Halifax,* 107 S.Ct. 2211, the Supreme Court provided a framework for analyzing whether a state law falls within the scope of ERISA's preemption clause. In that case, the state law at issue was evaluated in light of the language of section 514(a), the underlying purpose of the preemption provision, and the overall objectives of ERISA itself. 107 S.Ct. at 2215.

The statute at issue in *Fort Halifax* required employers who closed a plant with 100 or more employees to provide severance payments to the displaced workers. The amount of the payments was determined by the employee's salary and the number of years he or she was employed at the plant. Examining the language of section 514(a), the Supreme Court rejected the appellant's argument that ERISA preempted all state legislation regarding employee benefits. 107 S.Ct. at 2215.

> ERISA's pre-emption provision does not refer to state laws relating to "employee benefits," but to state laws relating to "employee benefit *plans*".... The words "benefit" and "plan" are used separately throughout ERISA, and nowhere in the statute are they treated as the equivalent of one another. Given the basic difference between a "benefit" and a "plan," Congress' choice of language is significant in its pre-emption of only the latter.

107 S.Ct. at 2215–16.

The second factor considered in *Fort Halifax* was whether preemption of the state law would further the purpose of ERISA's preemption clause. The preemption provision foreclosed the possibility of a "patchwork scheme of regulation [which] would introduce considerable inefficiencies in benefit program operation." 107 S.Ct. at 2217.

Pre-emption ensures that *the administrative practices of a benefit plan* will be governed by only a single set of regulations.

107 S.Ct. at 2217 (emphasis added). *Accord, Borges,* 869 F.2d at 146–47 ("What triggers ERISA preemption is not just any indirect effect on administrative procedures but rather an effect on the primary administrative functions of benefit plans, such as determining an employee's eligibility for a benefit and the amount of that benefit."); *Martori Brothers Distributors v. James–Massengale,* 781 F.2d 1349, 1356–57 (9th Cir.1986) (the principle underlying judicial interpretation of section 514(a) is that state law is preempted "if it regulates the matters regulated by ERISA: disclosure, funding, reporting, vesting, and enforcement of benefit plans"), *opinion amended,* 791 F.2d 799 (9th Cir.), *cert. denied,* 479 U.S. 949, 107 S.Ct. 435, 93 L.Ed.2d 385 (1986).

The third factor considered in *Fort Halifax* was whether the state law implicates the regulatory concerns of ERISA itself. ERISA was enacted to safeguard the interests of plan participants and their beneficiaries in the operation of employee benefit plans. 107 S.Ct. at 2219. To the extent any state law threatens the "administrative integrity of benefit plans," it runs afoul of the statute's regulatory concerns. 107 S.Ct. at 2219. This would include any state law which would put the employer "to the choice of operating separate ongoing benefit plans or a single plan subject to different regulatory requirements" in various states. 107 S.Ct. at 2220.

Applying the *Fort Halifax* analysis to the rule at issue in this case, the Court notes first that the 3–to–1 rule neither requires employers to establish benefit plans nor is "specifically designed to affect" such plans. The rule is a law of general application which applies to any jobsite where apprentice pipefitters are working without regard to whether they are participating in an apprenticeship program.

To determine whether the rule "relates to" an employee benefit plan, *Fort Halifax* directs the Court to look at the purpose of the ERISA preemption clause and the underlying regulatory concerns of ERISA. The 3–to–1 rule does not implicate any of the administrative practices regulated by ERISA. It does not alter the terms of eligibility or the amount of benefits to be distributed to a participant. It does not impose any funding, vesting, reporting or enforcement requirements. Accordingly, the rule has no effect on "the primary administrative functions of benefit plans," *Borges,* 869 F.2d at 146. Because the rule mandates a specific "teacher-student" ratio, it does however have an incidental effect on the plans' administration procedures. This limits the number of participants in the training program and affects how training can be done. It also imposes higher costs on plan administrators who must hire more journeymen to supervise their apprentices.

Plaintiffs focus their argument for preemption on the impact of the rule on their plan. They argue that any state law whose impact which is not tenuous, remote or peripheral was intended to be preempted. Plaintiffs also argue that the rule is preempted because it directly regulates a "term" of their training programs.

The scope of section 514(a) is not determined solely by the impact a state law has on employee benefit plans. While a number of courts have borrowed the "too tenuous, remote or peripheral" language from *Shaw* to express their conclusion that a state law is not preempted by ERISA,[9] the courts have not limited their section 514(a) analysis to an attempt to measure the degree of the challenged law's effect. A number of state laws which impose substantial administrative burdens and increased costs for ERISA plans have been found outside the scope of section 514(a). *See* citations *supra* at 1438–39.

**9.** In a footnote, the *Shaw* Court stated:

Some state actions may affect employee benefit plans in too tenuous, remote, or peripheral a manner to warrant a finding that the law "relates to" the plan. The present litigation plainly does not present a borderline question, and we express no views about where it would be appropriate to draw the line.

103 S.Ct. at 2901 n. 21 (citation omitted).

Plaintiffs' next argument presents a closer question. Plaintiffs cite *Shaw* and *Baxter v. Lynn*, 886 F.2d 182 (8th Cir.1989) for the proposition that any state law which regulates a "term" of an employee benefit plan must be preempted. In *Shaw*, the Supreme Court found that two New York statutes came within section 514(a): a human rights statute which prohibited employers from structuring benefit plans in a manner which discriminated on the basis of pregnancy and a disability benefits statute which required employers to pay sick-leave benefits to employees unable to work because of pregnancy. In *Baxter*, the United States Court of Appeals for the Eighth Circuit considered whether Missouri's common law rule prohibiting subrogation by an insurer with an independent obligation to pay for medical expenses arising from an automobile accident fell within the scope of section 514(a). This law, which prevented plans from requiring reimbursement in the event of recovery from a third party, was held to "clearly" relate to the employee benefit plan. 886 F.2d at 185.

The state laws at issue in both *Shaw* and *Baxter* had the effect of dictating what benefits could or could not be provided under ERISA benefit plans. Each of the laws had an impact on primary administrative functions regulated by ERISA. The impact of the 3-to-1 rule is considerably different. That rule does not affect the type of benefits available to a participant, the means by which claims are processed, reviewed or paid, the applicable reporting and disclosure requirements, or any of the administrative practices governed by ERISA. The rule mandates a particular teacher-student ratio. One result is to limit the number of apprentices who can participate in the program. Another is to increase the opportunities each apprentice has to work with licensed pipefitters and increase the oversight of each apprentice's work. To that extent, it does affect the form and amount of training received by each participant. These incidental effects are, however, no different than the effect of other traditional occupational licensing requirements. For example, Minnesota currently requires candidates for a journeyman's license to have had four years of pipefitting experience and to pass a test covering specified subject matter. Through these requirements, the state determines the length and the content of apprenticeship training. Despite this effect, these requirements are clearly not preempted by ERISA. Likewise, as plaintiffs concede, the state could prohibit anyone but a licensed pipefitter from performing high pressure pipefitting. This would have an even more drastic impact on plaintiff's apprenticeship programs than the 3-to-1 rule. But again, despite the fact that it determines the "term" of an ERISA program, this rule would not be subject to ERISA's preemption provision.

■ The 3-to-1 rule is not preempted because it is a rule of general application concerning a subject traditionally reserved to the states which has no implications for ERISA's regulatory concerns and only an incidental effect on the administration of training programs. It in no way threatens the administrative integrity of employee benefit plans. The rule does not in any way conflict with Congress' purpose in enacting ERISA "to provide for a uniform source of law in the areas of vesting, funding, insurance and portability standards, for evaluating fiduciary conduct, and for creating a single reporting and disclosure system in lieu of burdensome multiple reports." H.R.Rep. No. 533, 93d Cong.2d Sess., *reprinted in* 1974 U.S.Code Cong. & Admin.News 4639, 4655; S.Rep. No. 127 (93rd Cong.2d Sess., *reprinted in*, 1974 U.S.Code Cong. & Admin. News 4838, 4871. The rule is an occupational training requirement enacted to protect public safety. Even with ERISA's broad preemption provision, we "must presume that Congress did not intend to pre-empt areas of traditional state regulation." *Metropolitan Life Insurance Co. v. Massachusetts*, 471 U.S. 724, 105 S.Ct. 2380, 2389, 85 L.Ed.2d 728 (1985). This presumption is bolstered here by the absence of any federal policy governing the training or supervision of high pressure pipefitters.

On the basis of the foregoing analysis, the Court concludes that Minnesota's 3-

to–1 rule governing the use of apprentice pipefitters is not preempted by ERISA.

### II.  NLRA Preemption

Unlike ERISA, the NLRA contains no statutory preemption provision. Nevertheless, the Supreme Court has articulated two distinct bases for NLRA preemption of state laws. The first of these is known as the *Garmon* rule. The Court held in *San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959) that the states may not regulate conduct that is actually or arguably regulated by sections 7 or 8 of the NLRA. The *Garmon* rule "protects the primary jurisdiction of the [National Labor Relations Board] to determine in the first instance what kind of conduct is either prohibited or protected by the NLRA." *Metropolitan Life,* 105 S.Ct. at 2394. The second NLRA preemption doctrine is called the *Machinists* rule based upon *International Association of Machinists and Aerospace Workers v. Wisconsin Employment Relations Comm'n,* 427 U.S. 132, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976). *Machinists* preemption prohibits state regulation of conduct associated with the bargaining process. That process was declared an area intended by Congress "to be controlled by the free play of economic forces." 427 U.S. at 140, 96 S.Ct. at 2553.

### A.  *Garmon Preemption*

█ Plaintiffs contend that the 3–to–1 rule is preempted because it requires non-union employers and employees to conform to a term of collective bargaining in violation of section 8's prohibition against unfair labor practices. Section 8 of the NLRA prohibits interference with the right to choose not to bargain collectively. 29 U.S.C. § 158(a).

Plaintiffs' argument is without merit. The 3–to–1 rule simply does not force plaintiffs to bargain with any labor organization. Under the rule, the employer plaintiffs may continue to hire only non-union workers to do pipefitting and the employee plaintiffs may continue to choose not to affiliate with a labor organization. Conse-

quently, the Court holds that the 3–to–1 rule is not preempted by the *Garmon* rule.

### B.  *Machinists Preemption*

Plaintiffs argue that the 3–to–1 rule is preempted under the *Machinists* rule because, by requiring all contractors to abide by the union shop ratio, the rule is alleged to have substantially intruded on the collective bargaining process. Moreover, plaintiffs argue that the rule gives an impermissible economic advantage to union contractors.

█ The case law does not support the plaintiffs' position. In *Metropolitan Life,* 105 S.Ct. 2380, the Supreme Court considered whether a state law mandating that minimum health care benefits be included in insurance policies was preempted under the *Machinists* rule. The Court held that "minimum state labor standards" were not preempted under *Machinists* because those standards "affect union and nonunion employees equally, and neither encourage nor discourage the collective-bargaining process." 105 S.Ct. at 2397. Noting that the states have great latitude in protecting public health and safety and that state laws in those areas will inevitably intersect with the laws governing employers, employees and unions, the Court stated:

> Federal labor law in this sense is interstitial, supplementing state law where compatible, and supplanting it only when it prevents the accomplishment of the purposes of the federal Act.

105 S.Ct. at 2398.

In each of the cases where the *Machinists* preemption has been found, the preempted law had no justification apart from a desire to put pressure on a party to settle a labor dispute. In this case, the state adopted a minimum labor standard to address safety concerns stemming from the installation of high pressure piping and the training of apprentice pipefitters. While there is some suggestion in the record that the rule was also motivated by a desire to promote the interests of labor in the International Falls dispute, plaintiffs concede that the existence of a legitimate purpose for the rule makes the existence of

other potential motive irrelevant to their claim. The mere fact that the rule adopts a ratio identical to that contained in collective bargaining agreements does not compel the conclusion that the state has "undercut[ ] collective bargaining." *Fort Halifax,* 107 S.Ct. at 2222. The record demonstrates that the 3-to-1 rule is a minimum labor standard adopted to assure the adequate training and supervision of apprentices which is not inconsistent with the goals of the NLRA. Accordingly, the 3-to-1 rule is not preempted under the *Machinists* rule.

Finally, plaintiffs, informed of the Court's intention to grant defendant's motion for summary judgment and vacate the January 31, 1990 temporary restraining order, have moved to keep the TRO in effect pending appeal. The Court rejects that motion, but will in the interests of justice allow plaintiffs fourteen days from the date of this order to seek a stay pending appeal from the United States Court of Appeals for the Eighth Circuit.

Based on the foregoing, and upon the Court's independent de novo determination of the Magistrate's report, findings and recommendation, and the Court finding itself in agreement with the report and recommendation, and based upon the reasoning contained herein,

IT IS ORDERED that:

1.  plaintiffs' objections to the March 30, 1990 report and recommendation are overruled;

2.  the Court adopts the report and recommendation;

3.  defendant's motion for summary judgment is granted;

4.  plaintiffs' motions for preliminary and permanent injunctive relief are denied; and

5.  the January 31, 1990 temporary restraining order is vacated effective fourteen days after the date of this order.

LET JUDGMENT BE ENTERED ACCORDINGLY.