WASHINGTON SERVICE CON-
TRACTORS COALITION, et
al., Plaintiffs,

v.

DISTRICT OF COLUMBIA,
et al., Defendants.

Civ. A. No. 94–1127.

United States District Court,
District of Columbia,
Civil Division.

July 11, 1994.

1220

Peter Chatilovicz, Anita Barondes, Seyfarth, Shaw, Fairweather & Geraldson, Washington, DC, for plaintiffs.

Steven John Anderson, Office of Corp. Counsel, Carol Rae Golubock, Washington, DC, for Service Employees Intern. Union and Service Employees.

## REVISED [1] MEMORANDUM OPINION

THOMAS F. HOGAN, District Judge.

The plaintiffs in this case, a group of private contractors, are challenging a newly-enacted District of Columbia statute, the Displaced Workers Protection Act of 1994, D.C.Code §§ 36–1501 et seq. ("the DWPA"). After carefully considering the plaintiffs' arguments, as well as those of the defendants and intervenors, the Court finds that the DWPA is preempted by the National Labor

1. After the Court issued its Memorandum Opinion on July 8, 1994, the Court discovered that there were several typographical errors in the Opinion. This Revised Memorandum Opinion corrects those errors but does not make any substantive changes.

2. The parties dispute several issues of fact relating to the general hiring practices of the plaintiffs and other service contractors. However, these facts are not material to the legal issues before the Court.

3. The text of the DWPA reads:

Sec. 2. Covered employees.
(a) This act shall apply to the following employees, except persons employed less than 15 hours per week and except persons employed in an executive, administrative, or professional capacity as defined by the Secretary of Labor under § 13(a)(1) of the Fair Labor Standards Act (129 U.S.C. § 213(a)(1)) [sic] or required by District of Columbia law in effect on the effective date of this act to possess an occupational license:
 (1) Employees hired by a contractor as food service workers in a hotel, restaurant, cafeteria, apartment building, hospital, nursing care facility, or similar establishment.
 (2) Employees hired by a contractor to perform janitorial or building maintenance services in an office building, institution, or similar establishment.
 (3) Non-professional employees hired by a contractor to perform health care or related support services in a hospital, nursing care facility, or similar establishment.
(b) For the purposes of this act "Contractor" includes a subcontractor and means an individual or company that employs 25 or more persons.
Sec. 3. Transition employment period.

Relations Act, 29 U.S.C. §§ 151 et seq. ("the NLRA"), and is thus invalid and unenforceable. Accordingly, the Court will grant summary judgment in favor of the plaintiffs.

## I. BACKGROUND

The relevant facts in this case do not appear to be in dispute.[2] The DWPA was enacted by the Council of the District of Columbia ("the City Council") and approved by Mayor Sharon Pratt Kelly on February 17, 1994. It became law on April 26, 1994, following a period of congressional review. The DWPA essentially requires contractors who provide certain types of services to retain many of their predecessors' employees after the contractors have taken over service contracts.[3]

(a) The present contractor within a period of 10 days after the awarding of a contract shall make available to prospective contractors the names of all employees of the present contractor employed at the site or sites covered by the prospective contract, the date each employee was hired, and the employee's occupation classification.

(b) The new contractor who is awarded a contract to provide similar covered services provided by the previous contractor shall retain, for a 90–day transition employment period, covered employees who have been employed by the previous contractor for the preceding 8 months or longer at the site or sites covered by the contract.

(c) If at anytime, the new contractor determines that fewer employees are required to perform the new contract than were required by the previous contractor, the new contractor shall retain employees by seniority within job classifications.

(d) During the 90–day transition employment period, the new contractor shall maintain a preferential hiring list of eligible covered employees not retained by the new contractor from which the new contractor may hire additional employees.

(e) Except as provided in subsection (c) of this section, the new contractor shall not discharge an employee retained pursuant to this act during the 90–day transition period without cause.

(f) At the end of the 90–day transition employment period, the new contractor shall perform a written performance evaluation for each employee retained pursuant to this act. If the employee's performance during the 90–day transition period is satisfactory, the new contractor shall offer the employee continued employment under

The DWPA applies to contractors who employ 25 or more persons and perform food, janitorial, building maintenance, and health care services. D.C.Code § 36–1501(a)(1)–(3). Section 3(a) of the DWPA requires an outgoing contractor at a particular site to provide the contractor who will succeed it at the site with a list of employees, the dates the employees were hired, and their occupation classifications. *Id.* § 36–1502(a). Section 3 goes on to state that if the new contractor is providing services similar to those of the previous contractor, it is then required to retain for 90 days all employees who had been employed by the previous contractor for eight months or more.[4] *Id.* § 36–1502(b). During that 90–day period, the new contractor may not dismiss a retained employee without cause. *Id.* § 36–1502(e). After the 90–day transition period, if a written evaluation indicates that the employee's performance has been satisfactory, § 3(f) states that the new contractor "shall offer" continued employment to the retained employee under terms established by the new contractor. *Id.* § 36–1502(f). Section 4 provides that any employee who has been wrongfully discharged may sue in the Superior Court of the District of Columbia and obtain backpay, costs of lost employment benefits, and reasonable attorney's fees. *Id.* § 36–1503.

According to the Report of the Committee on Labor, the purpose of the DWPA is:

> the terms and conditions established by the new contractor.
>
> (g) If a contractor's contract at an establishment in the District of Columbia is not renewed, and within 30 days the contractor is awarded a similar contract at another establishment in the District of Columbia, the contractor shall retain 50% of the employees from each establishment as needed to perform the contract.
> Sec. 4. Enforcement.
> (a) An employee who has been wrongfully discharged by a new contractor may bring an action in the Superior Court of the District of Columbia and may be awarded:
>
> (1) Back pay for each day the violation continues at a rate of compensation not less than the higher of:
> (A) The average regular rate of pay received by the employee during the last 3 years of the employee's employment in the same occupation classification; or
> (B) The final regular rate received by the employee; and

to prohibit contractors or subcontractors who acquire or provide services under a negotiated or competitive bidding procedure from displacing employees employed by the contractor or subcontractors who loss [sic] or gave up the contract by establishing a 90–day probationary period during which the contractor or subcontractor is prohibited from terminating an employee except for just and sufficient cause.

Report on Bill 10–307, Intervenors' Motion for Summary Judgment, Appendix B ("Intervenors' Appendix B") at 1.[5]

The legislative history indicates that the City Council heard testimony in favor of and against the DWPA. Carolyn Jones, the Deputy Director for Employment Security Services at the District of Columbia's Department of Employment Services testified in favor of the DWPA, saying that the law "could significantly impact the reduction of the number of unemployed D.C. residents currently collecting unemployment benefits in the job categories covered by the bill." *Id.* at 14. This testimony and other parts of the legislative history suggest that the DWPA was passed in order to prevent certain workers from becoming unemployed merely because a service contract has changed hands. *See, e.g., id.* at 18–22, 61–71. The DWPA was strongly backed by the members of Local 82 of the Service Employ-

> (2) Costs of benefits the new contractor would have incurred for the employee under the new contractor's benefit plan.
> (b) In any suit, the court shall allow the prevailing party reasonable attorney's fees as part of the costs recoverable.
> (c) This act shall not be construed to limit an employee's right to bring a common law cause of action for wrongful termination.
> Sec. 5. Rules.
> The Mayor shall promulgate rules to implement this act.
> D.C.Code §§ 36–1501 to 36–1504.

**4.** This is subject to an exception for times when the new contractor determines that fewer employees are necessary to perform the contracted services. In those situations, the new contractor is required to retain employees based upon seniority within their job classifications. *Id.* § 36–1502(c).

**5.** This legislative history is also attached to the motion to dismiss filed by defendants District of Columbia and Kelly.

ees International Union ("SEIU"), which has supported a campaign called Justice for Janitors. *See id.* at 55–62. The DWPA also drew some support from the business community. *See id.* at 23–28, 45–48. However, several other business groups and the District of Columbia Chamber of Commerce opposed the DWPA. *See id.* at 29–44, 73–86.

The plaintiffs are companies that have contracts to perform various food, janitorial or building maintenance services in the District of Columbia area. Some of the plaintiffs are non-union companies. P & R Enterprises, one of the plaintiffs, took over a contract in the District on April 30, 1994, and expects to take over additional contracts in the immediate future. It has received communications from Local 82 of the SEIU in which the union local demands recognition because it represents employees whom P & R was required to hire under the DWPA. Affidavit of Richard Thompson at ¶¶ 2, 11. At least one predecessor's supervisor has asked P & R to retain her pursuant to the DWPA. Second Affidavit of Richard Thompson at ¶ 2.

On May 24, 1994, the plaintiffs filed this action and requested a temporary restraining order to enjoin the enforcement of the DWPA. The plaintiffs challenge the DWPA on various grounds. The plaintiffs claim that the DWPA is preempted by the NLRA, 29 U.S.C. §§ 151 *et seq.,* and the Labor Management Relations Act, 29 U.S.C. § 185. The plaintiffs also allege that the DWPA violates the Contracts Clause of the United States Constitution, U.S. Const. art. I, § 10. The plaintiffs claim, *inter alia,* that the DWPA's retention provisions effectively require nonunion contractors to recognize unions.

After a hearing on May 25, 1994, the Court denied the motion for a temporary restraining order and consolidated this matter pursuant to Fed.R.Civ.P. 65(a)(2). On June 7, 1994, the Court conducted a hearing on the consolidated dispositive motions.[6] At the hearing, the Court permitted the SEIU and

SEIU Local 82 to intervene as defendants in this matter pursuant to Fed.R.Civ.P. 24(b). After hearing argument on the motions, the Court took this matter under advisement.

## II. DISCUSSION

The plaintiffs argue that the DWPA is preempted by the NLRA for several reasons: (1) the DWPA interferes with the plaintiffs' right under the NLRA to fire or refuse to hire supervisors because of their union involvement; (2) the DWPA deprives the plaintiffs of the freedom to choose their own representatives for purposes of adjusting grievances; (3) the DWPA deprives the plaintiffs of their federally protected right to hire their own work force upon taking over a contract; and (4) the DWPA interferes with the plaintiffs' freedom to set initial terms of employment. The plaintiffs further argue that the DWPA impairs their contract rights under the United States Constitution.

■■■ There are two dominant theories of NLRA preemption.[7] These theories stem from *San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 244, 79 S.Ct. 773, 779, 3 L.Ed.2d 775 (1959), and *Machinists v. Wisconsin Employment Relations Comm'n,* 427 U.S. 132, 140, 96 S.Ct. 2548, 2553, 49 L.Ed.2d 396 (1976). *Garmon* holds that state or local regulations of activities are preempted when the activities are protected or prohibited by the NLRA. 359 U.S. at 244–45, 79 S.Ct. at 779–80. In order to avoid interference with national policy, state or local activities may be preempted under *Garmon* when the activity is even "arguably" protected or prohibited by the NLRA. *Id. Machinists* holds that state or local regulations are preempted when they attempt to govern actions that Congress intended to leave unregulated. 427 U.S. at 140–41, 96 S.Ct. at 2553–54. The parties dispute whether either preemption theory applies to the DWPA.

---

6. The plaintiffs' motion for a preliminary injunction is treated as a motion for summary judgment. Defendants District of Columbia and Mayor Kelly have filed a motion to dismiss. The intervenors have also filed a motion for summary judgment.

7. Theories of federal preemption are based upon the Supremacy Clause of the Constitution, which states that federal law "shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2.

## A. The DWPA and Contractors' Selection of Supervisors

 The plaintiffs argue that the NLRA invalidates the DWPA because the DWPA conflicts with § 14(a) of the NLRA.[8] Section 14(a) provides that employers are not required to treat "supervisors" as "employees." 29 U.S.C. § 164(a).[9] Specifically, § 14(a) states that "no employer subject to this Act shall be compelled to deem individuals defined herein as supervisors as employees for the purpose of any law, either national or local, relating to collective bargaining." *Id.* This provision specifically excludes supervisors from protection so that employers may demand loyalty from their supervisors. *Florida Power & Light Co. v. Electrical Workers,* 417 U.S. 790, 812, 94 S.Ct. 2737, 2748, 41 L.Ed.2d 477 (1974). Employers may, in fact, insist that a supervisor refrain from any union activity. *Id.* The plaintiffs argue that the DWPA conflicts with the NLRA and must be enjoined because the DWPA fails to exempt supervisors from its requirements.[10]

The Court must first examine the DWPA to determine whether its protections extend to supervisors, as the plaintiffs allege. Section 2 of the DWPA lists types of covered employees, including food service workers, janitors, and non-professional health care workers, but does not use the word "supervisors." D.C.Code § 36–1501(a)(1)–(3). Section 2 also states that the DWPA does not apply to persons who work less than 15 hours a week, those "employed in an executive, administrative, or professional capacity" as defined by the Fair Labor Standards Act or those required by District law to possess a license. *Id.* § 36–1501(a). Since the DWPA specifically exempts certain types of employees from its coverage but does not exempt supervisors, it appears that the DWPA, on its face, applies to supervisors.

 The legislative history of the DWPA further suggests that the City Council expressly considered whether or not to exclude supervisors and chose not to do so. A prior

8. The defendants argue that the plaintiffs' challenge is not ripe. In order for a matter to be ripe for review, the plaintiffs must demonstrate that their injury or threat of injury is both "real and immediate" and not merely "conjectural" or "hypothetical." *Golden v. Zwickler,* 394 U.S. 103, 108–10, 89 S.Ct. 956, 959–61, 22 L.Ed.2d 113 (1969). Although plaintiffs are not always required to wait for actual enforcement before challenging a statute, the mere existence of a statute that plaintiffs reasonably believe should apply to and be enforced against them does not create a case or controversy. *United Public Workers v. Mitchell,* 330 U.S. 75, 91, 67 S.Ct. 556, 565, 91 L.Ed. 754 (1947), *overruled on other grounds by Adler v. Board of Education,* 342 U.S. 485, 72 S.Ct. 380, 96 L.Ed. 517 (1952). Because present harms can flow from the threat of future actions, declaratory relief can sometimes be granted to protect against a feared future event. In such situations, the plaintiff must demonstrate that the probability of the future event occurring is real and substantial and of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. *Armstrong World Industries v. Adams,* 961 F.2d 405, 412 (3d Cir.1992).

The plaintiffs in this case have demonstrated a real and substantial probability of harm. The plaintiffs have provided affidavits that indicate that contractors have received demands that they hire the employees of their predecessors. Affidavit of Richard Thompson at ¶ 11; Second Affidavit of Richard Thompson at ¶ 2; Affidavit of Joel Felrice at ¶¶ 2, 6. Some of these demands appear to be made by the SEIU. *E.g.,* Second

Affidavit of Richard Thompson at ¶ 2 and Attachments. Additionally, at least one supervisor has requested that a contractor retain her pursuant to the DWPA. *Id.* at ¶ 2. Finally, at least one action has been filed in which employees seek to enforce the DWPA. *See Adams v. Washington Hospital Center,* Civil Action No. 94–1351 (JHG) (removed from District of Columbia Superior Court). These facts suggest that the plaintiffs' concerns are not merely speculative. If the plaintiffs fail to retain workers as required by the DWPA, they face the very real possibility that they will have to defend themselves against numerous lawsuits and risk paying significant amounts of potential damages and attorney's fees. Thus, the Court finds that this action is ripe.

9. Section 2(3) of the NLRA also specifically excludes supervisors from the definition of employees. 29 U.S.C. § 152(3).

10. This challenge pursuant to § 14(a) does not technically appear to be a *Garmon* preemption argument. *Garmon* is concerned with preemption of state regulation of actions that are protected under § 7 or prohibited under § 8 of the NLRA. 359 U.S. at 244–45, 79 S.Ct. at 779–80. Section 14(a) specifically prohibits state or local laws that deem supervisors to be employees. However, both § 14(a) and *Garmon* preemption are geared toward the same goal: invalidating state or local laws that interfere with federal labor law.

draft of the DWPA specifically excluded "supervisory" employees. Intervenors' Appendix B at 8. Further, Carolyn Jones of the Department of Employment Services specifically mentioned in her testimony that the definition of employee had been narrowed to eliminate supervisors from the DWPA's coverage. *Id.* at 14. Nevertheless, supervisors were not expressly excluded in the final version of the DWPA that has become law. In light of the fact that the City Council expressly considered this matter and even exempted supervisors in a prior draft of the DWPA, the City Council's failure to exempt supervisors in the final version of the DWPA strongly suggests that the City Council intended for the DWPA to apply to supervisors. Thus, the Court finds that supervisors are covered employees within the meaning of the DWPA.

■ Recognizing that the DWPA applies to supervisors, the plaintiffs argue that the DWPA impermissibly infringes upon contractors' NLRA rights. Absent the DWPA, a contractor taking over a contract from a predecessor would have no duty to hire the predecessor's supervisors. If the predecessor contractor was unionized, its supervisors may very well have loyalties that are not consistent with the philosophy of the new contractor. The plaintiffs argue that the DWPA improperly forces them to hire supervisors who may not be loyal to them. They further argue that the DWPA may limit their ability to fire these supervisors if they later learn that their supervisors are not loyal. If an employer chooses either not to hire or to fire a supervisor, the plaintiffs argue that they will be forced to litigate issues including whether the particular worker was actually a supervisor and whether the reasons for firing the supervisor constituted cause under the DWPA.

The fact that the DWPA treats supervisors as employees raises serious concerns. The Supreme Court of the United States has held that the portion of § 14(a) of the NLRA that relieves "the employer of obligations under any law, either national or local, relating to collective bargaining applies to any law that requires an employer to accord to the front line of management the anomalous status of employees." *Beasley v. Food Fair of North Carolina, Inc.,* 416 U.S. 653, 662, 94 S.Ct. 2023, 2028, 40 L.Ed.2d 443 (1974) (citations and internal quotations omitted). In *Beasley,* the Supreme Court found that a North Carolina right-to-work law providing a cause of action to individuals discharged because of their union membership could not be applied to supervisors. *Id.* at 655–56, 94 S.Ct. at 2024–25. The Court found that the enforcement of such a state statute would be inconsistent with § 14(a)'s goal of allowing employers to ensure that their supervisors are loyal to management. *Id.* at 659–62, 94 S.Ct. at 2026–28. When viewed in light of *Beasley,* it appears that the DWPA conflicts with § 14(a) by requiring employers to treat supervisors as employees and thus infringes upon contractors' abilities to ensure the loyalty of their supervisors. Additionally, like the right-to-work law in *Beasley,* the DWPA also appears to violate § 14(a) because it provides supervisors with a cause of action if they are discharged for union activities.

The defendants argue that § 14(a) does not conflict with the DWPA because the DWPA is not a law "relating to collective bargaining." This argument has some initial appeal because the DWPA does not make any explicit references to collective bargaining. Although the DWPA does not discuss collective bargaining, it nevertheless has a substantial effect on the collective bargaining relationships between contractors and their employees. For example, the DWPA may, in some instances, serve as a means of imposing a duty to bargain upon a contractor who did not have unionized employees prior to the DWPA.[11] In addition, the DWPA appears to require contractors to retain their predecessors' supervisors even if the supervisors are members of a union and are not loyal to their employers. In such applications, the DWPA certainly relates to collective bargaining.

The defendants also attempt to construct interpretations of the DWPA that would avoid the concerns raised by § 14(a). The defendants first argue that the DWPA does not raise any problems under § 14(a) be-

11. The Court will discuss this matter in further detail *infra.*

cause it does not specifically require that supervisors be retained in supervisory positions. The defendants further argue that even if supervisors must be retained as supervisors, lack of loyalty to the new contractor would provide sufficient cause to justify dismissal under § 2(e) of the DWPA. D.C.Code § 1502(e). Such interpretations, they argue, eliminate any concerns related to § 14(a) of the NLRA. These arguments do not persuade the Court.

Although the defendants argue that a predecessor's supervisor may be retained in a nonsupervisory capacity, the Court can find no support for this interpretation of the DWPA. The text of the DWPA does not state that a supervisor may be retained in a nonsupervisory position. In fact, the text suggests the opposite conclusion. Section 3(a) of the DWPA states that a predecessor contractor should provide information about each "employee's employment classification" to an incoming contractor. D.C.Code § 36–1502(a). Also, the DWPA states that if a new contractor cannot hire all eligible employees, it should retain employees based on seniority "within job classification." *Id.* § 36–1502(c). These references to job classifications suggest that the City Council anticipated that employees (including supervisors) would be retained in positions within the same job classification. Additionally, the defendants' interpretation of the DWPA presents practical concerns. For example, if a contractor is required to hire a predecessor's supervisors and employees, it would be required either to place some of the retained workers in supervisory positions or to bring in additional outside supervisors, increasing the contractor's costs. Affidavit of Joel Felrice at ¶ 7.[12] The defendants have pointed to

nothing in the text or legislative history that would support their view that the DWPA does not require supervisors to be retained in supervisory positions. The Court will not attempt to construe the DWPA in a manner inconsistent with its plain language merely because a novel interpretation might prevent the DWPA from being invalidated. *Aptheker v. Secretary of State,* 378 U.S. 500, 515–16, 84 S.Ct. 1659, 1668–69, 12 L.Ed.2d 992 (1964).[13]

The Court is also unpersuaded by the defendants' argument that the § 14(a) problem may be avoided if "cause" in § 3(e) of the DWPA is interpreted to permit contractors to discharge supervisors who refuse to refrain from union activities. Even if the forthcoming regulations or the Superior Court's interpretations consider § 14(a) and cases such as *Beasley,* any actions brought by supervisors in the Superior Court would still require courts to decide whether or not a particular individual was, in fact, a supervisor and whether the individual was actually discharged for reasons that are compatible with § 14(a) of the NLRA. Such determinations are difficult NLRA questions that should not be left to the District of Columbia courts, but should be consistently determined by the NLRB in accordance with federal labor policy. *Local 926, Int'l Union of Operating Engineers v. Jones,* 460 U.S. 669, 681, 103 S.Ct. 1453, 1461, 75 L.Ed.2d 368 (1983).[14]

The Court finds that the DWPA requires contractors to retain their predecessors' supervisors and requires contractors to retain the supervisors in supervisory positions. To the extent that the DWPA requires employers to retain supervisors in supervisory positions, it directly conflicts with federal labor policy as enunciated in § 14(a) of the NLRA.

---

**12.** The Court also notes that one of the plaintiffs has received correspondence from the SEIU indicating that at least one supervisor, Rosalina Aleman, sought to be retained pursuant to the DWPA. Second Affidavit of Richard Thompson at ¶ 2. The fact that Aleman designated herself as a supervisor and that the request was made on SEIU letterhead suggests that both the SEIU and Aleman would like Aleman retained as a supervisor. This contradicts the argument being presented to the Court.

**13.** Theoretically, the defendants' interpretation could find support in the forthcoming regula-

tions. However, the Court must make its decision based upon the statute and the record before it, not based upon speculation about how the Mayor might interpret the statute. Further, even if the defendants' interpretations of the DWPA were correct, the DWPA is nevertheless invalidated by *Machinists* preemption, as discussed *infra.*

**14.** For example, the meaning of the term "supervisors" is frequently litigated and continues to be interpreted by the Supreme Court. *See NLRB v. Health Care & Retirement Corp.,* —— U.S. ——, 114 S.Ct. 1778, 128 L.Ed.2d 586 (1994).

Accordingly, the Court finds that the DWPA's application to supervisors must be enjoined.[15]

## B. The DWPA's Effect on Contractors' Rights to Hire Workers

In addition to challenging the DWPA as it applies to supervisors, the plaintiffs attack the DWPA as a whole. The plaintiffs argue that the DWPA impermissibly intrudes into contractors' hiring decisions and is subject to *Machinists* preemption because Congress intended for hiring decisions to be unregulated. First, the plaintiffs argue that the DWPA improperly regulates their right to hire whomever they wish. Second, they argue that the DWPA will cause contractors who take over unionized workforces to become successors because a majority of their employees will have been employees of their predecessors. Third, they argue that because new contractors will know from the outset that a majority of their employees will be former employees of their predecessors, the right to set initial terms and conditions will be superseded by an immediate requirement to bargain with the unions. A review of the relevant law indicates that the plaintiffs are correct.

The Supreme Court has stated that employers have "the rightful prerogative ... independently to rearrange their businesses." *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 549, 84 S.Ct. 909, 914, 11 L.Ed.2d 898 (1964). Despite this prerogative, if a new employer is considered to be a "successor" of a previous employer, the new employer has an obligation to bargain with the union that represented the previous employer's workers. *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 40–46, 107 S.Ct. 2225, 2234–37, 96 L.Ed.2d 22 (1987). The determination as to whether an employer is a successor is a factual one which focuses on whether there is a substantial continuity between the old and new enterprises. *Id.* at 43, 107 S.Ct. at 2236.[16] The focus is on whether retained employees view their job situations as essentially unaltered. *Id.* Thus, if a new employer makes a conscious decision to hire a majority of its employees from its predecessor and maintains the same general business, the new employer is a successor with a duty to bargain with a union. *Id.* at 41, 107 S.Ct. at 2234–35.

Although a successor is obligated to bargain with a union, a successor is "ordinarily free to set initial terms on which it will hire the employees of a predecessor" and is not bound by the terms of the predecessor's collective bargaining agreement. *NLRB v. Burns International Security Servs., Inc.*, 406 U.S. 272, 294, 92 S.Ct. 1571, 1585–86, 32 L.Ed.2d 61 (1972). The duty to bargain does not arise until the successor has hired a "substantial and representative complement" of its employees. *Fall River Dyeing & Finishing Corp.*, 482 U.S. at 47, 107 S.Ct. at 2238. If, at that time, a majority of a successor's employees are individuals who had been employed by the predecessor, the duty to bargain with the union that represented the predecessor's employees arises. *Id.* However, if it is clear from the beginning that a successor will retain all of a predecessor's employees, a duty to bargain over initial terms and conditions of employment may arise immediately. *Burns*, 406 U.S. at 294–95, 92 S.Ct. at 1585–86.

The defendants argue that although the NLRA does not require a successor to hire a predecessor's employees, it does not bar states from regulating whom successors choose to hire. This position ignores the goal of *Machinists* preemption. The mere fact that the NLRA does not protect or

---

**15.** The plaintiffs have also argued that the DWPA should be preempted under *Garmon* because it restrains employers' abilities to select their collective bargaining representatives under § 8(b)(1)(B) of the NLRA. Because the Court finds that the DWPA's application to supervisors conflicts with § 14(a) of the NLRA, it does not need to address this argument.

**16.** In determining whether there is substantial continuity, the NLRB examines a number of factors, including: whether the business of the employers is essentially the same; whether the employees of the new company are doing the same jobs in the same conditions under the same supervisors; and whether the new entity has the same production process, produces the same products, and basically has the same body of customers. *Id.*

prohibit certain conduct does not mean that the conduct cannot be preempted by the NLRA. Where, as here, a state or local statute attempts to regulate an area that Congress intended to leave to be determined by the free play of economic forces and the statute significantly affects the balance of power between labor and management, the statute is preempted. *Machinists*, 427 U.S. at 140–51, 96 S.Ct. at 2553–58.

An employer's hiring selections are fundamental decisions that Congress has only regulated in very limited situations. In *Burns*, the Supreme Court stated that an employer has no obligation to hire any of its predecessor's employees. 406 U.S. at 280 n. 5, 92 S.Ct. at 1578 n. 5. In *Howard Johnson Co. v. Hotel Employees*, 417 U.S. 249, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974), the Court expanded this concept, stating that *Burns* establishes that an employer "had the right not to hire any" of its predecessor's employees, if it so desired. *Id.* at 262, 94 S.Ct. at 2243. The Court also stated that a new employer has a "right to operate the enterprise with his own independent labor force." *Id.* at 264, 94 S.Ct. at 2244. These rights are only limited by § 8(a)(3) of the NLRA, which prohibits discrimination on the basis of union membership or activity. 29 U.S.C. § 158(a)(3). Thus, the vast majority of an employer's hiring decisions have been left unregulated by the NLRA.

In light of this lack of regulation, the Court must decide whether Congress intentionally left this area to be controlled by the free play of economic forces so that *Machinists* preemption applies. *Machinists*, 427 U.S. at 140, 96 S.Ct. at 2553; *Metropolitan Life Insurance Co. v. Massachusetts*, 471 U.S. 724, 749, 105 S.Ct. 2380, 2394, 85 L.Ed.2d 728 (1985). *Machinists* preemption has been applied to situations where states seek to regulate traditional economic weapons of labor and management. *E.g., Golden State Transit Corp. v. Los Angeles*, 475 U.S. 608, 619, 106 S.Ct. 1395, 1401, 89 L.Ed.2d 616 (1986) (invalidating city action conditioning renewal of taxi franchise on settlement of labor dispute). However, it is not used indiscriminately and has not been applied to strike down state laws that establish minimum labor standards. *E.g., Metropolitan Life Insurance Co.*, 471 U.S. at 752–58, 105 S.Ct. at 2395–99 (mandatory minimum mental health care benefit not preempted); *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 20–23, 107 S.Ct. 2211, 2222–24, 96 L.Ed.2d 1 (1987) (mandatory one-time severance payment after plant closing not preempted). The Court has found no cases directly addressing whether *Machinists* preemption should apply when a state or local statute or regulation curtails a private employer's hiring decisions.

The defendants argue that *Machinists* preemption is inappropriate here because the DWPA does not directly affect collective bargaining agreements and does not regulate any traditional economic weapons of management or labor. This oversimplifies *Machinists* preemption and takes a myopic view of the effects of the DWPA. The DWPA on its face requires contractors to hire certain individuals on a temporary basis and then offer them employment if their performance is satisfactory. D.C.Code § 36–1502. Neither the parties nor the Court are aware of any other state or local statute that affirmatively requires private employers to hire particular individuals.[17] The unprecedented nature of this intrusion on an employer's prerogative to select members of its workforce suggests that an employer's hiring decisions are matters that Congress purposely allowed to be governed by the free market.[18] The DWPA

---

17. Congress and the District have passed laws prohibiting private employers from refusing to hire individuals for discriminatory reasons. *See* Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.*; District of Columbia Human Rights Act, D.C.Code §§ 1–2501 *et seq.* However, no jurisdiction has previously told a private employer via legislation that it must hire particular individuals regardless of the reasons why the employer may not wish to hire the individuals.

18. The fact that no state or local government has previously attempted to force a private employer to hire specific individuals belies any argument that the DWPA is simply an attempt to regulate matters "so deeply rooted in local law that courts should not assume that Congress intended to preempt application of state law." *Belknap, Inc. v. Hale*, 463 U.S. 491, 508, 103 S.Ct. 3172, 3181–82, 77 L.Ed.2d 798 (1983). This is an area that state and local governments have never before attempted to regulate.

certainly inhibits the free play of economic forces by restricting an employer's freedom to make hiring decisions, but it is not clear whether this inhibition on free enterprise alone would be adequate to justify NLRA preemption.

Regardless of whether the DWPA's effect on free enterprise would raise preemption concerns, its collateral impact on collective bargaining so significantly alters the balance of power between labor and management that this Court must find that the DWPA is preempted by the NLRA. *Machinists,* 427 U.S. at 149–151, 96 S.Ct. at 2557–58. Unlike the statutes in *Fort Halifax Packing Co.* and *Metropolitan Life Insurance Co.,* the DWPA does not simply set a minimum labor standard. Instead, it creates a system that "impermissibly intrude[s] upon the collective bargaining process." *Fort Halifax Packing Co.,* 482 U.S. at 23, 107 S.Ct. at 2223. By requiring employers to retain their predecessors' employees, the DWPA attempts to mandate that employers become "successors" for NLRA purposes. This serves to impose upon employers a duty to bargain that would not necessarily arise in the free market. The DWPA's effect will become even greater in some situations because the duty to bargain will arise immediately, precluding an employer from even setting the initial terms and conditions of employment. Such effects interfere significantly with the traditional collective bargaining positions of labor and management.

These collateral effects of the DWPA are not merely speculative. At least one of the plaintiffs has already received a demand from the SEIU seeking to bargain over initial terms and conditions of employment.[19] *See* Second Affidavit of Richard Thompson at ¶ 2 and Attachments. P & R Enterprises, Inc. was awarded a contract to clean a building in May, 1994. *Id.* In a letter dated May 23, 1994, Jay Hessey, Executive Director of Local 82 of the SEIU, indicated that the workers at the building were represented by the union. *Id.* The letter further requested that P & R begin bargaining over the initial terms and conditions of employment. *Id.*[20] As discussed *supra,* no duty to bargain ordinarily arises unless a majority of the employees of a successor employer were employees of the predecessor employer. *Fall River,* 482 U.S. at 41, 107 S.Ct. at 2234–35. Absent the DWPA, there is no question that there would be no duty to bargain with the union merely because P & R was awarded the contract. The DWPA alters this scenario by requiring contractors such as P & R to retain workers whom they may not wish to hire and triggering a duty to bargain with the union that represents these workers.

This hiring requirement and its role in triggering the duty to bargain serves to upset the balance of power between labor and management. The DWPA upsets this balance by placing nonunion companies in positions where they will be required to recognize unions when they take over contracts from predecessors with unionized workforces. This puts employers in a worse position than they would be in the free market as envisioned by the NLRA. It also serves to put unions in a better position by relieving them of the time and expense ordinarily related to seeking recognition and bargaining rights. Once a union gains a foothold in a particular site, the DWPA effectively serves to keep that site unionized, regardless of what company takes over the contract at that site. This is not consistent with the NLRA.

The DWPA does not interfere in collective bargaining relationships every time it applies. Its improper effect is limited to situations where a contractor takes over a contract at a site where the employees were previously organized and represented by a union. Nevertheless, the long-term effect of the DWPA's hiring requirements would be to entrench unions at particular sites. Under the law prior to the passage of the DWPA, a

---

19. Additionally, the SEIU and several individuals have filed a suit seeking to enforce the DWPA. *See Adams,* Civil Action No. 94–1351. The defendants in that suit are not parties to this action.

20. This situation involving P & R, the fact that other plaintiffs are or will soon take over contracts in the District of Columbia, and the fact that at least one lawsuit has been filed under the DWPA all indicate that there is a real controversy at stake here. The Court thus finds that these claims are also ripe for review.

bargaining obligation would only arise if a new employer made "a conscious decision to maintain generally the same business and to hire a majority of its employees from the predecessor." *Id.* Under the DWPA, employers' hiring choices are no longer conscious decisions. The duty to bargain becomes a matter of course when a contractor takes over a new site. Such a result provides substantial additional power to labor unions.[21] Thus, in passing the DWPA, the District of Columbia "has put its thumb on the balance scale between management and labor in a private industry, which a local government may not do." *Alameda Newspapers, Inc. v. City of Oakland,* No. C–93–3500–CAL, 1994 WL 180668, at *6, 1994 U.S.Dist. LEXIS 5960, at *16 (N.D.Cal. April 29, 1994) (municipal resolution endorsing boycott of newspaper until labor dispute resolved preempted under *Machinists* ).[22] Accordingly, the Court finds that the DWPA is preempted by the NLRA.[23] There being no genuine issue of material fact, the plaintiffs are thus entitled to summary judgment pursuant Fed.R.Civ.P. 56.

## III. CONCLUSION

In attempting to require that contractors retain certain supervisors, the DWPA directly conflicts with § 14(a) of the NLRA. Addi-

tionally, the retention provisions of the DWPA are an unprecedented incursion into an area that was previously unregulated. In entering this area, the District's City Council has, whether consciously or not, upset the delicate balance between labor and management that is governed by the NLRA. Because the DWPA attempts to regulate an area that Congress has left unregulated and does so in a way that upsets the traditional balance of power in labor relations, the DWPA is preempted by the NLRA. Accordingly, the Court will grant summary judgment for the plaintiffs, deny the defendants' motion to dismiss, and deny the intervenors' motion for summary judgment. The Court will enter a declaratory judgment stating that the DWPA is unenforceable because it is preempted by the NLRA and permanently enjoin the defendants from enforcing the DWPA.

---

**21.** The defendants assert that the plaintiffs are arguing for a right to discriminate against unionized workers. Such discrimination is prohibited. 29 U.S.C. § 158(a)(3). Nevertheless, there are numerous legitimate and nondiscriminatory reasons why a successor may not want to hire its predecessors' employees. For example, an employer may choose not to hire a particular worker because of that individual's past attendance record, poor work quality, prior insubordination or for a myriad of other reasons. Since the quality of an employer's workers may affect the awarding of future contracts, the hiring decision is an important economic tool. The DWPA strips the plaintiffs of this legitimate and valuable economic tool while simultaneously adding to the plaintiffs' collective bargaining obligations by creating a system that will impose collective bargaining obligations where they would not normally exist. This deprives employers of their rights and disrupts the collective bargaining process. *Machinists,* 427 U.S. at 146–48, 96 S.Ct. at 2556–57.

**22.** It cannot be argued that the DWPA's effect on collective bargaining was an unforeseen conse-

quence. The legislative history indicates that the City Council was told that the DWPA could force a new employer to recognize and bargain with a union that represented the employees of a contractor's predecessor. Intervenors' Appendix B at 78. Additionally, a noted labor law scholar has written an article in which he speculates about the collateral effects of a hypothetical state statute that attempts to protect employees' jobs when a business changes hands. Michael H. Gottesman, *Rethinking Labor Law Preemption: State Laws Facilitating Unionization,* 7 Yale J. on Reg. 355, 418–25 (1990). In this article, Professor Gottesman specifically discusses how such a hypothetical statute could interact with federal labor laws to impose a duty to bargain with a union from the moment an employer purchases an existing company. *Id.* at 424. Although this article reaches a different conclusion than this Court as to whether such a statute would be preempted by the NLRA, its author admits that his opinions may be colored by his extensive experiences representing unions. *Id.* at 355.

**23.** Because of the Court's holding, it will express no view on the plaintiffs' claims that the DWPA violates the Contracts Clause.